# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

---

Integrated Process Solutions, Inc.,

        Plaintiff,

vs.

Lanix LLC, Kevin Landsverk, and Dylan Dyke,

        Defendants.

Court File No.:  19-cv-00567

Hon. \_\_\_\_\_

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER, EXPEDITED DISCOVERY, AND PRESERVATION OF EVIDENCE**

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 2

ARGUMENT .......................................................................................................................... 18

I.  Defendants Should Be Temporarily Enjoined from Acting in Furtherance of Their
    Unlawful Conspiracy ................................................................................................ 19

    A.  IPS Will Likely Succeed on its Breach of the Duty Claims.................................. 19

    B.  IPS Will Likely Succeed on its Trade Secret Misappropriation Claims ............... 21

    C.  IPS Is Likely to Succeed on Its Computer Fraud and Abuse Act Claim .............. 23

    D.  The Threat of Irreparable Harm and the Balance of Harms Warrants a TRO ....... 25

    E.  Other Factors Support Issuance of a TRO............................................................. 26

II. Good Cause Exists to Order IPS's Narrow Expedited Discovery Requests .............. 28

III. Defendants Must Preserve All Potentially Relevant Evidence................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*,
  2015 WL 7575925 (M.D.N.C.).................................................................... 25

*Bellboy Seafood Corp. v. Nathanson*,
  410 N.W.2d 349 (Minn. App. 1987)........................................................... 19

*Commodities Specialists Co. v. Brummet*,
  2002 WL 31898166 (D. Minn.) .................................................................. 27

*CPI Card Grp., Inc. v. Dwyer*,
  294 F.Supp.3d 791 (D. Minn. 2018)........................................................... 25

*Creative Comm. Consultants, Inc. v. Gaylord*,
  403 N.W.2d 654 (Minn. App. 1987)........................................................... 22

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ...................................................................... 19

*E\*Trade Sec. LLC v. Deutsche Bank AG*,
  230 F.R.D. 582 (D. Minn. 2005).................................................................. 31

*Eaton Corp. v. Giere*,
  971 F.2d 136 (8th Cir. 1992) ...................................................................... 20

*Edudata Corp. v. Scientific Comps., Inc.*,
  599 F.Supp. 1084 (D. Minn. 1984)............................................................. 28

*Fidlar Tech. v. LPS Real Estate Data Sols., Inc.*,
  810 F.3d 1075 (7th Cir. 2016) .................................................................... 23

*Gillman v. Sprint Comm. Co.*,
  2002 WL 31497311 (Utah) .......................................................................... 29

*H&R Block Enters., Inc. v. Short*,
  2006 WL 640508 (D. Minn.) ....................................................................... 29

*Heather K. v. City of Mallard*,
  887 F.Supp. 1249 (N.D. Iowa 1995)........................................................... 28

*Hlubeck v. Beeler*,
 9 N.W.2d 252 (Minn. 1943) ....................................................................... 21

*Hood Packaging Corp. v. Steinwagner*,
 2014 WL 4436105 (D. Minn.) .................................................................... 27

*Hormel Healthlabs, Inc. v. Ventura Foods LLC*,
 2004 WL 2526423 (D. Minn.) .................................................................... 29

*Hot Stuff Foods, LLC v. Dornbach*,
 726 F.Supp.2d 1038 (D. Minn. 2010) ........................................................ 20

*Hypro, LLC v. Reser*,
 2004 WL 2905321 (D. Minn.) .................................................................... 18

*Int'l Controls Corp. v. Vesco*,
 490 F.2d 1334 (2d Cir. 1974) ..................................................................... 28

*Int'l Airport Ctrs., LLC v. Citrin*,
 440 F.3d 418 (7th Cir. 2006) ...................................................................... 23

*Klick v. Crosstown State Bank of Ham Lake, Inc.*,
 372 N.W.2d 85 (Minn. App. 1985) ............................................................. 27

*Langeland v. Farmers State Bank of Trimont*,
 319 N.W.2d 26 (Minn. 1982) ..................................................................... 27

*McLeodUSA Telecomms. Servs., Inc. v. Qwest Corp.*,
 361 F.Supp.2d 912 (N.D. Iowa 2005) ........................................................ 28

*McNeilus Fin., Inc. v. Dininni*,
 2002 WL 31655819 (D. Minn.) .................................................................. 25

*Medtronic, Inc. v. Advanced Bionics Corp.*,
 630 N.W.2d 438 (Minn. App. 2001) ...................................................... 26, 27

*Merck & Co. Inc. v. Lyon*,
 941 F.Supp. 1443 (M.D.N.C. 1996) ........................................................... 24

*Midwest Sports Marketing, Inc. v. Hillerich & Bradsby of Can., Ltd.*,
 552 N.W.2d 254 (Minn. App. 1996) ........................................................... 19

*Minn. Mining & Mfg. Co. v. Kirkevold*,
 87 F.R.D. 324 (D. Minn. 1980) .................................................................. 25

*Prime Therapeutics LLC v. Beatty*,
354 F.Supp.3d 957 (D. Minn. 2018) ........................................................ 21

*Prudential Ins. Co. of Am. v. Sandvold*,
2012 WL 245161, *modified*, 845 F.Supp.2d 971 (D. Minn. 2012) ............................. 18

*Qwest Comm. Int'l, Inc. v. WorldQuest Networks, Inc.*,
213 F.R.D. 418 (D. Colo. 2003) ........................................................ 29, 30

*Randt Recycling Techs., Inc. v. Lee's Oil Serv., LLC*,
2011 WL 3610700 (D. Minn.) ............................................................ 18

*Rehab. Specialists, Inc. v. Koering*,
404 N.W.2d 301 (Minn. App. 1987) ...................................................... 19

*Saliterman v. Finney*,
361 N.W.2d 175 (Minn. App. 1985) ...................................................... 22

*Sanitary Farm Dairies, Inc. v. Wolf*,
112 N.W.2d 42 (1961) .................................................................. 19

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
208 F.R.D. 273 (N.D. Cal. 2002) .................................................. 28, 29, 30

*Softchoice, Inc. v. Schmidt*,
763 N.W.2d 660 (Minn. App. 2009) ...................................................... 27

*State by McClure v. Sports & Health Club, Inc.*,
370 N.W.2d 844 (Minn. 1985) .......................................................... 20

*Strategic Directions Group, Inc. v. Bristol–Myers Squibb Co.*,
293 F.3d 1062 (8th Cir. 2002) ......................................................... 22

*TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*,
2013 WL 6827348 (D. Minn.) ........................................................... 22

*Thermorama, Inc. v. Buckwold*,
125 N.W.2d 844 (Minn. 1964) .......................................................... 26

*Traffic Tech, Inc. v. Sarinske*,
2007 WL 2460410 (Minn. Dist.) .................................................... 19, 20, 29

*United States v. Trotter*,
478 F.3d 918 (8th Cir. 2007) .......................................................... 24

*Webb Pub'g Co. v. Fosshage*,
    426 N.W.2d 445 (Minn. App. 1988)....................................................................... 25, 28

*Workers Compensation Recovery, Inc. v. Marvin*,
    2004 WL 1244404 (Minn. App.) ................................................................. 20

*Xcedex, Inc. v. VMware, Inc.*,
    2011 WL 2600688 ......................................................................................... 24

## STATUTES

18 U.S.C. § 1030 .............................................................................................23-24

18 U.S.C. § 1832 ............................................................................................... 23

18 U.S.C. § 1836 ............................................................................................... 22

18 U.S.C. § 1839(3) .......................................................................................... 21

Minn. Stat. Ann. § 325C....................................................................................21-22

Defendant Kevin Landsverk ("Landsverk") used his special status as the lead IT security employee of Plaintiff Integrated Process Solutions, Inc. ("IPS") in order to (1) steal IPS's confidential and trade secret information; (2) maintain "backdoor" access to IPS's computer servers so he can steal information in the future; (3) create a competing company—Defendant Lanix LLC ("Lanix")—whose operation relies entirely on stolen IPS information; (4) establish a kick-back scheme with Defendant Dylan Dyke ("Dyke"), who is employed with a key IPS customer, designed to siphon off IPS business to Lanix; and (5) destroy evidence of his wrongdoing by wiping his IPS-issued computing devices. Shockingly, Landsverk did this all while still employed—and getting paid—by IPS.

Defendants' actions are currently irreparably harming IPS. IPS requests that the Court shut down Defendants' unlawful activities pending further proceedings. Specifically, IPS asks first for a temporary restraining order ("TRO") barring Defendants from further using or disclosing its confidential information and trade secrets, including from the backup IPS server that Landsverk still possesses at his home. Second, IPS seeks limited expedited discovery so that a fuller picture of the relevant facts and circumstances can be presented to the Court at a hearing on IPS's preliminary injunction motion. Third, IPS also seeks an order requiring Defendants to turn over any electronic devices they have recently used to a third-party vendor for forensic imaging and inspection.

Applicable law and the balance of equities strongly support such relief because Landsverk and Dyke clearly intend to use the information they stole in order to unlawfully compete with, and irreparably harm, IPS.

# Factual Background

## I.     IPS's Business

Since its founding in 2008, IPS has designed, built, implemented, and integrated electrical control systems in Minnesota, Wisconsin, and other parts of the Midwest. Some of the specialized goods IPS manufactures and sells include custom solenoid, remote terminal, or programmable controller panels; protective relaying cabinets; Distribution Control System control rooms; and photovoltaic systems. Declaration of Peter Nelson ("Nelson Decl.") ¶ 1.

IPS's goods and services are often put to use by large entities, including but not limited to industrial or municipal operators of water and wastewater systems. But IPS typically does not have a direct commercial relationship with these large entities. Instead, IPS most often collaborates with general contractors, builders, or other manufacturing companies that are responsible for the project that will include IPS's goods or services. In other words, IPS typically plays a role similar to that of a sub-contractor. *Id*. ¶¶ 4-5.

IPS has a reputation for cultivating and maintaining solid, long-term customer relationships. To achieve this reputation, IPS insists on strict adherence to project schedules; compliance with defined safety practices; unmatched levels of customer service in its industry; and strategic staffing to most efficiently serve its clients. Additionally, IPS and its staff are also highly regarded for the breadth and depth of their expertise in the industrial and municipal water/wastewater industry. *Id*. ¶¶ 6-7.

## II.    Landsverk's Employment at IPS

On June 17, 2013, IPS offered Landsverk a full-time position as a Design & Field

Engineer. In that capacity, Landsverk was responsible for learning and utilizing the following areas of knowledge: IPS's system drawings, AutoCAD programming, operator interface programming, human machine interface configuration and programming, radio telemetry, network switches, access control systems, surveillance and IP camera systems, instrumentation, motor control, variable frequency drives, and process controls for the water/wastewater industry. *Id.* ¶¶ 10-11 & Ex. A.

Nonetheless, because of its size, IPS expects many of its employees to perform a wide range of duties. *Id.* ¶ 3. Consistent with this policy and practice, the scope of Landsverk's duties increased over the course of his tenure at IPS. Indeed, by the time he departed IPS, Landsverk worked as a *de facto* IT specialist, salesperson, and project manager in addition to his original duties as a field engineer. Landsverk was a valuable and integral member of IPS. *Id.* ¶ 11.

By virtue of his position, for at the very least a year prior to his departure from IPS on February 9, 2019, Landsverk had intimate knowledge of the following critical pieces of information regarding IPS and its business:

- The business and contractual nature of IPS's relationship with its customers;

- The key contacts at various IPS customers;

- The amount of money IPS collected pursuant to at least some of the contracts it had with its customers;

- The costs to IPS of completing and delivering its goods and services to its customers;

- IPS's process for bidding for specific goods or services;

- The location and organization of IPS's IT systems, including but not limited to hardware, software, databases, information repositories, and enterprise resource planning systems;

- Software, programming, and other IPS-designed control codes that IPS uses in its systems; and

- The key skills, talents, and competencies of various individuals at IPS as well as their approximate compensation.

*Id.* ¶ 12.

IPS took and continues to take significant steps to protect the confidentiality of its information, including but not limited to limiting access to its offices and computer systems, requiring employees to use computer passwords, and purchasing insurance against data breaches. IPS took and continues to take such steps because it derives a competitive and, therefore, economic advantage simply by keeping some and/or all of that information confidential. Declaration of Lori Arnold ("Arnold Decl.") ¶ 2.

## III. Landsverk and Dyke Conspire to Harm IPS

By virtue of his position, Landsverk came into contact and developed a professional relationship with Dyke, a system engineer at one of IPS's customers, Corval. *Id.* ¶ 24.

Over the course of their professional relationship, Landsverk and Dyke bonded over what they believed was inadequate remuneration for all their work. In particular, Dyke believed he should have been compensated for directing Corval's work to Landsverk (and, therefore, to IPS) and Landsverk believed he was entitled to higher pay

for bringing in Corval work. *See* Arnold Decl. Ex A, rows 2749-2751.[1]

| 2751 | **From:** +16517283436 Dyke Dylan | 11/16/2018 11:53:58 PM(UTC+0) | Incoming | Well you better March your ass up in there and say "six hundred fucking thousand dollars and nothing for me and Dylan" |
| 2750 | From: +16517283436 Dyke Dylan | 11/16/2018 11:54:24 PM(UTC+0) | Incoming | If he says it's not gonna happen then start your own company |
| 2749 | From: +16517283436 Dyke Dylan | 11/17/2018 12:01:35 AM(UTC+0) | Incoming | Yeah, that's where I'm at |

With dissatisfaction mounting, while Landsverk was still employed by IPS, Landsverk and Dyke agreed to conspire against IPS by wrongfully taking, using, and disclosing IPS's confidential and trade secret information in order to compete with IPS. By way of example, Landsverk told Dyke that IPS Owner Peter Nelson "came and asked me about upcoming opportunities. He got all excited and I saw something with the financial guy that he depends on our work now to hit sales numbers." Immediately thereafter, he told Dyke that it "[w]ould be so fun to pull all these opportunities away from him." *See id*., rows 2259-60.

The cornerstone of Landsverk's and Dyke's conspiracy was an illegal kick-back scheme. Dyke withheld Corval work from IPS and instead steered it toward Landsverk (and, therefore, Lanix). *See id*., rows 156-61; 276-84; 291-94; 1197-1204.

---

[1] The text messages between Landsverk and Dyke are attached as Exhibit A to the Arnold Declaration. An "Incoming" message is from Dyke; an "Outgoing" message is from Landsverk. Texts are cited herein by row numbers in the exhibit.

| 161 | From: +16517283436 Dyke Dylan | 1/26/2019 7:17:45 PM(UTC+0) | Incoming | Ok well how much does IPs have invested in lamb Weston? Why can't we just pay what we owe cancel rest PO and then you take it as Lanix? |
|---|---|---|---|---|
| 160 | From: +16517283436 Dyke Dylan | 1/26/2019 7:18:10 PM(UTC+0) | Incoming | Would have to steal drawings and be ok with not making too much |
| 159 | From: +16517283436 Dyke Dylan | 1/26/2019 7:18:15 PM(UTC+0) | Incoming | At Lanix I mean |
| 158 | From: +16517283436 Dyke Dylan | 1/26/2019 7:18:34 PM(UTC+0) | Incoming | Turkey contherm set you up by yourself for a few months I'd think? |
| 157 | To: +16517283436 Dyke Dylan | 1/26/2019 7:18:48 PM(UTC+0) | Outgoing | Yeah for sure |
| 156 | From: +16517283436 Dyke Dylan | 1/26/2019 7:19:34 PM(UTC+0) | Incoming | We will tell IPs that lamb is doing own controls Which i need a what you've spent email so we could tell lamb so possible cancel it anyway? But the ultimate shit is if it's canceled canceled you would only have contherms |

| 284 | From: +16517283436 Dyke Dylan | 1/22/2019 2:46:35 AM(UTC+0) | Incoming | Just want lamb to approve damn thing so you can get done |
|---|---|---|---|---|
| 283 | From: +16517283436 Dyke Dylan | 1/22/2019 2:46:46 AM(UTC+0) | Incoming | Get Lanix, start with contherms |
| 282 | From: +16517283436 Dyke Dylan | 1/22/2019 2:46:52 AM(UTC+0) | Incoming | Maybe get Sterling? |
| 281 | To: +16517283436 Dyke Dylan | 1/22/2019 2:47:07 AM(UTC+0) | Outgoing | Sterling would be such a blessing |
| 280 | To: +16517283436 Dyke Dylan | 1/22/2019 2:47:10 AM(UTC+0) | Outgoing | Perfect first job |
| 279 | To: +16517283436 Dyke Dylan | 1/22/2019 2:47:16 AM(UTC+0) | Outgoing | Second |
| 278 | From: +16517283436 Dyke Dylan | 1/22/2019 2:47:17 AM(UTC+0) | Incoming | Contherms first job |

| 277 | To:<br>+16517283436<br>Dyke Dylan | 1/22/2019<br>2:47:19<br>AM(UTC+0) | Outgoing | Whatever :) |
|---|---|---|---|---|
| 276 | From:<br>+16517283436<br>Dyke Dylan | 1/22/2019<br>2:47:22<br>AM(UTC+0) | Incoming | Waiting for Lanix..... |

| 294 | To:<br>+16517283436<br>Dyke Dylan | 1/22/2019<br>1:24:11<br>AM(UTC+0) | Outgoing | Yeah seemed that way. Mark must have got some positive feedback from Jamie I'm guessing. And I never had to be onsite at all for that. Thanks for setting that up dude! |
|---|---|---|---|---|
| 293 | From:<br>+16517283436<br>Dyke Dylan | 1/22/2019<br>1:24:49<br>AM(UTC+0) | Incoming | Your welcome, just hope....we can get more than a little sshe panel there now.....sure they considering options now |
| 292 | To:<br>+16517283436<br>Dyke Dylan | 1/22/2019<br>1:25:15<br>AM(UTC+0) | Outgoing | Fingers crossed |
| 291 | To:<br>+16517283436<br>Dyke Dylan | 1/22/2019<br>1:39:11<br>AM(UTC+0) | Outgoing | Did you get Sterling eggs then???? |

| 1204 | **From:**<br>+16517283436<br>Dyke Dylan | 1/7/2019<br>3:05:35<br>AM(UTC+0) | Incoming | People gonna call that # all the time |
|---|---|---|---|---|
| 1203 | **To:**<br>+16517283436<br>Dyke Dylan | 1/7/2019<br>3:06:00<br>AM(UTC+0) | Outgoing | Yeah probably, but right now it's only Hormel. That literally it who calls me. |
| 1202 | **From:**<br>+16517283436<br>Dyke Dylan | 1/7/2019<br>3:13:45<br>AM(UTC+0) | Incoming | Can't fuck us with lamb |
| 1201 | **To:**<br>+16517283436<br>Dyke Dylan | 1/7/2019<br>3:14:14<br>AM(UTC+0) | Outgoing | Uuuuugh, well tell me how I should handle it? |
| 1200 | **From:**<br>+16517283436<br>Dyke Dylan | 1/7/2019<br>3:14:48<br>AM(UTC+0) | Incoming | I'll hold all other POs to IPs, you can work on those on your own before POs at Lanix |
| 1199 | **To:**<br>+16517283436<br>Dyke Dylan | 1/7/2019<br>3:15:20<br>AM(UTC+0) | Outgoing | Ok, that gives me more time to setup company too then |
| 1198 | **From:**<br>+16517283436<br>Dyke Dylan | 1/7/2019<br>3:15:37<br>AM(UTC+0) | Incoming | Easily tell Pete bellisio not send corval po yet |
| 1197 | **To:**<br>+16517283436<br>Dyke Dylan | 1/7/2019<br>3:16:27<br>AM(UTC+0) | Outgoing | Right |

In exchange, Landsverk (and Lanix) promised to give Dyke a percentage of the profits made on each such project at Lanix. For example, Landsverk told Dyke, "Fuuuuck. Dude we gotta do this one ourselves. Could pocket like 10g each on top of fair profit." Dyke later told Landsverk, "I'll hold all other Pos to IPs, you can work on those on your own before Pos at Lanix." *See id.*, rows 1111-1127; 1856-67.

| 1127 | **To:** +16517283436 Dyke Dylan | 1/8/2019 12:47:44 AM(UTC+0) | Outgoing | Ha! You'll get something. Early on with me! |
|---|---|---|---|---|
| 1126 | **From:** +16517283436 Dyke Dylan | 1/8/2019 12:50:19 AM(UTC+0) | Incoming | 12.5% profit of jobs over 50k |
| 1125 | **From:** +16517283436 Dyke Dylan | 1/8/2019 12:51:11 AM(UTC+0) | Incoming | Nothing on jobs under 50k |
| 1124 | **From:** +16517283436 Dyke Dylan | 1/8/2019 12:51:28 AM(UTC+0) | Incoming | Negotiated per job after 500k |
| 1122 | **To:** +16517283436 Dyke Dylan | 1/8/2019 12:51:50 AM(UTC+0) | Outgoing | Now come the terms! |
| 1119 | **From:** +16517283436 Dyke Dylan | 1/8/2019 12:52:20 AM(UTC+0) | Incoming | Gotta be worth it for you |
| 1118 | **From:** +16517283436 Dyke Dylan | 1/8/2019 12:53:10 AM(UTC+0) | Incoming | No? |
| 1116 | **To:** +16517283436 Dyke Dylan | 1/8/2019 12:54:35 AM(UTC+0) | Outgoing | This seems like a conversation over a big meal face to face no? |
| 1115 | **From:** +16517283436 Dyke Dylan | 1/8/2019 12:54:58 AM(UTC+0) | Incoming | On a 50k job be 25% profit or 12500, so my "cut" be like 1500 |
| 1114 | **To:** +16517283436 Dyke Dylan | 1/8/2019 12:55:01 AM(UTC+0) | Outgoing | I'm pretty open to ideas |
| 1113 | **From:** +16517283436 Dyke Dylan | 1/8/2019 12:56:01 AM(UTC+0) | Incoming | Yeah just throwing it out there |
| 1112 | **To:** +16517283436 | 1/8/2019 12:56:46 | Outgoing | Yeah that seems reasonable |

| | | | | |
|---|---|---|---|---|
| | Dyke Dylan | AM(UTC+0) | | |
| 1111 | **From:** +16517283436 Dyke Dylan | 1/8/2019 12:57:19 AM(UTC+0) | Incoming | And as your company grows and "we" get known then maybe I become partner |
| 1867 | **To:** +16517283436 Dyke Dylan | 12/28/2018 11:52:34 PM(UTC+0) | Outgoing | Well I can only get excited about new company working on your stuff. IPS holding us both back |
| 1866 | **To:** +16517283436 Dyke Dylan | 12/28/2018 11:53:09 PM(UTC+0) | Outgoing | Oh u suppose you've got an mcc involved on this one? |
| 1865 | **To:** +16517283436 Dyke Dylan | 12/28/2018 11:53:11 PM(UTC+0) | Outgoing | Nice :) |
| 1864 | **To:** +16517283436 Dyke Dylan | 12/28/2018 11:53:15 PM(UTC+0) | Outgoing | I* |
| 1863 | **To:** +16517283436 Dyke Dylan | 12/28/2018 11:53:33 PM(UTC+0) | Outgoing | Fuck...I need to quote that. |
| 1862 | **From:** +16517283436 Dyke Dylan | 12/28/2018 11:53:52 PM(UTC+0) | Incoming | Weee! What you think of comps? |
| 1861 | **To:** +16517283436 Dyke Dylan | 12/28/2018 11:54:58 PM(UTC+0) | Outgoing | Oh I didn't register that I'd be powering them |
| 1860 | **To:** +16517283436 Dyke Dylan | 12/28/2018 11:55:00 PM(UTC+0) | Outgoing | Nice!!! |
| 1859 | **To:** +16517283436 Dyke Dylan | 12/28/2018 11:55:31 PM(UTC+0) | Outgoing | Fuuuuck. Dude we gotta do this one ourselves. Could pocket like 10g each on top of fair profit |
| 1858 | **To:** +16517283436 Dyke Dylan | 12/28/2018 11:55:38 PM(UTC+0) | Outgoing | Oh what could be... |
| 1857 | **From:** +16517283436 Dyke Dylan | 12/29/2018 12:11:43 AM(UTC+0) | Incoming | Meh don't get to greedy |
| 1856 | **To:** +16517283436 Dyke Dylan | 12/29/2018 12:13:10 AM(UTC+0) | Outgoing | Just sick of seeing the money go to waste. No bonus again this year. |

In furtherance of his conspiracy with Dyke, Landsverk formed and opened his own company while still employed at IPS. This rival company came to be named

Defendant Lanix, LLC. Landsverk filed the papers to organize the LLC on January 23, 2019, over two weeks before he announced his resignation. Nelson Decl. ¶ 23. Landsverk used IPS photos to create the website and had a brief testimonial from Corval Group, Inc., one of IPS's long-standing customers, on his website home page. Below is a snippet showing Lanix's website when it was up and running.

**Lanix − Custom system integration**
lanixtech.us/ ▾
... in system operation during startup." Corvalgroup Inc.Remote Access. Call or Email your custom needs for a quote. quotes@**lanixtech.us**. 218-230-2157.

The website was subsequently taken down, presumably after Landsverk was alerted that IPS had viewed it. *Id*. ¶ 24. The same day he formed his new company, Landsverk bragged to Dyke that he was continuing to work for IPS but doing no work. Arnold Decl. Ex. A, row 211 ("I need to be here this week since it's a jack off week for me. No work to do at IPS, can't pretend to be busy much longer ;)").

Notably, however, for the conspiracy to work, Lanix had to be able to perform the work Dyke would send in its direction. This required Landsverk and Lanix to misappropriate the confidential, proprietary, and trade secret information of IPS for Lanix's benefit, including IPS's confidential AutoCAD files, project management files, a Programable Logic Controller ("PLC") program with IPS-developed standards, human machine interfaces ("HMI")/operator interface terminals ("OIT") programming standards that IPS has created, and all the proprietary information used to create such files. Without that blueprint for doing business, Lanix would have no means of providing services to Corval or any other clients. *See* Nelson Decl. ¶ 27. And that is precisely what Landsverk

did. *See* Arnold Decl. Ex. A, rows 130, 147; 1922-24; 2131-36; 2258-60; 2572-77.

| 147 | From:<br>+16517283436<br>Dyke Dylan | 1/26/2019<br>10:20:55<br>PM(UTC+0) | Incoming | Step 1: Send price corval needs to pay IPS for lamb Weston for what has been complete with the understanding that there is a high possibility you won't be doing anymore for that job because lamb wants to do own controls<br>Step 1 Note: you will need to be willing to take over as Lanix for whatever is left from what we pay IPS<br>Step 2: 2 week notice IPS<br>Step 3A: get into corvals vendor list<br>Step 3B: possible finish lamb Weston with remaining funds "stealing" IPs drawings<br>Step 3C: As Lanix, send price (to be verbally discussed) for JOTs contherms<br>Step 3D: Take vacation/Etc. Operate as Lanix going to Smithfield |
| 130 | To:<br>+16517283436<br>Dyke Dylan | 1/27/2019<br>9:49:03<br>PM(UTC+0) | Outgoing | Don't you think getting into the vendor list should be before quitting IPS? |
| 1924 | **From:**<br>+16517283436<br>Dyke Dylan | 12/26/2018<br>1:52:50<br>PM(UTC+0) | Incoming | Only for money Harry!!! |
| 1923 | **From:**<br>+16517283436<br>Dyke Dylan | 12/26/2018<br>2:00:16<br>PM(UTC+0) | Incoming | Oh I didn't read it fully, yeah you can send it to Corval!! |
| 1922 | **From:**<br>+16517283436<br>Dyke Dylan | 12/26/2018<br>2:06:39<br>PM(UTC+0) | Incoming | Prolly not up yet.....but need to push that we get the autocad or whatever we did for the coils |
| 2136 | **To:**<br>+16517283436<br>Dyke Dylan | 12/21/2018<br>4:59:40<br>AM(UTC+0) | Outgoing | So go cheaper like Carl or go high dollar like an errin holtberg? |
| 2135 | **To:**<br>+16517283436<br>Dyke Dylan | 12/21/2018<br>5:00:10<br>AM(UTC+0) | Outgoing | Carl is good for programming which is the main grunt of what we do. |
| 2134 | **From:**<br>+16517283436<br>Dyke Dylan | 12/21/2018<br>5:00:25<br>AM(UTC+0) | Incoming | Fuck if I know dude |
| 2133 | **To:**<br>+16517283436<br>Dyke Dylan | 12/21/2018<br>5:00:32<br>AM(UTC+0) | Outgoing | I kinda like doing it all myself |

| 2132 | **From:** +16517283436 Dyke Dylan | 12/21/2018 5:00:39 AM(UTC+0) | Incoming | You couldn't do Dold |
|------|------|------|------|------|
| 2131 | **To:** +16517283436 Dyke Dylan | 12/21/2018 5:00:54 AM(UTC+0) | Outgoing | It gets cleaner and easier to re-use. Yeah dold was way too much |
| | | | | |
| 2260 | **To:** +16517283436 Dyke Dylan | 12/19/2018 12:07:00 AM(UTC+0) | Outgoing | Pete came and asked me about upcoming opportunities. He got all excited and I saw something with the financial guy that he depends on our work now to hit sales numbers |
| 2259 | **To:** +16517283436 Dyke Dylan | 12/19/2018 12:07:44 AM(UTC+0) | Outgoing | I'll see the exact details of why our work was important in a bit here when I open my computer again. Would be so fun to pull all these opportunities away from him. |
| 2258 | **From:** +16517283436 Dyke Dylan | 12/19/2018 12:09:17 AM(UTC+0) | Incoming | Yeah, that's true but....not sustainable right now lean on his water shit if we don't have shit |
| | | | | |
| 2577 | **To:** +16517283436 Dyke Dylan | 12/10/2018 3:05:13 PM(UTC+0) | Outgoing | k.ipsamerica.biz:8085 |
| 2576 | **From:** +16517283436 Dyke Dylan | 12/10/2018 3:59:42 PM(UTC+0) | Incoming | What's this login? |
| 2575 | **To:** +16517283436 Dyke Dylan | 12/10/2018 4:00:13 PM(UTC+0) | Outgoing | That's my erp system :) |
| 2574 | **To:** +16517283436 Dyke Dylan | 12/10/2018 4:00:24 PM(UTC+0) | Outgoing | This one is for my farm to practice on |
| 2573 | **From:** +16517283436 Dyke Dylan | 12/10/2018 4:00:45 PM(UTC+0) | Incoming | Well I have no user or password? |
| 2572 | **To:** +16517283436 Dyke Dylan | 12/10/2018 4:02:55 PM(UTC+0) | Outgoing | Oh I was just showing that off a little. Not much data in it yet |

The confidential files that Landsverk misappropriated provide IPS a competitive advantage over its competitors, and, in Lanix's hands, provide an unfair advantage to Lanix. IPS has significant value in the AutoCAD file format of the drawings that

Landsverk appears to have taken from IPS. This format contains confidential and trade secret IPS-created standards, and IPS has spent a considerable amount of money developing these standards. Landsverk was involved in the process of upgrading our files into AutoCAD Electric and knows the effort IPS invested into creating "blocks" and "schematics" to be utilized by the new software. As a project manager, Landsverk was involved in the process of identifying new products in his designs. IPS continues to add to its "block" database weekly, giving Landsverk reason to maintain access to IPS's computer systems. Arnold Decl. ¶¶ 7-8.

IPS also uses a PLC program with IPS-developed standards. A PLC is an industrial digital computer which has been ruggedized and adapted for the control of an activity (like utility plant operation) that requires high reliability control and ease of programming and process fault diagnosis. IPS assembles new projects from previously developed programs and "function blocks". IPS also has created HMI/OIT programming standards, which involves developing visual interface programs with screens and symbols for plant operation. Much like the PLC programming, once created these programs can be updated and utilized for future projects. IPS has invested hundreds of hours of programming work into developing these programs. Each project IPS completes continues to build our library and make future projects easier to develop. Landsverk contributed to this database through his IPS employment, and he fully understands the value of reusing programs; he eludes to this fact in his text messages with Dyke. IPS derives value from these drawings and files not being generally known by third parties, and are subject to reasonable efforts to maintain their secrecy. *Id*. ¶ 9.

In addition, through Landsverk's special IT responsibilities for IPS, he set up a computer server at his home to create a back-up copy of all of IPS's electronically stored information. This server gave Landsverk continued access to IPS's information necessary to perform the work that IPS performs. Nelson Decl. ¶¶ 14-15. Landsverk bragged to Dyke that he had left himself "several routes to get back into" IPS's computer systems even if his electronic access was disabled. *See* Arnold Decl. Ex. A, rows 1403-21.

| 1421 | **From:** +16517283436 Dyke Dylan | 1/6/2019 1:19:04 AM(UTC+0) | Incoming | That's 16 week lead time on equip, how fast can you make a coupa panels? |
|------|------|------|------|------|
| 1420 | **To:** +16517283436 Dyke Dylan | 1/6/2019 1:20:47 AM(UTC+0) | Outgoing | A small panel can be turned around in 3 weeks typically. |
| 1419 | **From:** +16517283436 Dyke Dylan | 1/6/2019 1:24:12 AM(UTC+0) | Incoming | SSHE job 6 of them only gotta add product pressure with VfD control |
| 1417 | **To:** +16517283436 Dyke Dylan | 1/6/2019 1:25:18 AM(UTC+0) | Outgoing | So we'd have a few to chew on for sure. Big bellisio would be a blessing of course |
| 1416 | **From:** +16517283436 Dyke Dylan | 1/6/2019 1:26:01 AM(UTC+0) | Incoming | Yeah it can be two panels or two screens |
| 1414 | **To:** +16517283436 Dyke Dylan | 1/6/2019 1:27:33 AM(UTC+0) | Outgoing | Sounds fun |
| 1413 | **To:** +16517283436 Dyke Dylan | 1/6/2019 1:27:38 AM(UTC+0) | Outgoing | And fucking easy |
| 1412 | **To:** +16517283436 Dyke Dylan | 1/6/2019 1:27:44 AM(UTC+0) | Outgoing | Since it all DONE |
| 1410 | **From:** +16517283436 Dyke Dylan | 1/6/2019 1:27:57 AM(UTC+0) | Incoming | If you can get the info? |
| 1409 | **From:** +16517283436 Dyke Dylan | 1/6/2019 1:28:03 AM(UTC+0) | Incoming | Better start that transfer? |
| 1406 | **To:** +16517283436 Dyke Dylan | 1/6/2019 1:28:19 AM(UTC+0) | Outgoing | Come on |

| 1405 | **To:** +16517283436 Dyke Dylan | 1/6/2019 1:28:44 AM(UTC+0) | Outgoing | I have a daily sync of the entire IPS server being sent to my house |
|---|---|---|---|---|
| 1404 | **To:** +16517283436 Dyke Dylan | 1/6/2019 1:28:54 AM(UTC+0) | Outgoing | It's actually an hourly sync I think |
| 1403 | **To:** +16517283436 Dyke Dylan | 1/6/2019 1:30:06 AM(UTC+0) | Outgoing | And will leave myself several routes to get back into the company if needed. |

Landsverk also used his personal email account (to hide it from IPS), to misappropriate IPS's financial documents. *See id.*, rows 1-2.

| 2 | To: +16517283436 Dyke Dylan | 1/29/2019 3:04:23 AM(UTC+0) | Outgoing | Did you get my email sent to your Gmail? |
|---|---|---|---|---|
| 1 | **To:** +16517283436 Dyke Dylan | 1/29/2019 3:04:30 AM(UTC+0) | Outgoing | That was that financial interesting document |

He also made sure to retain his entire IPS email folder, including the contacts. *See id.*, row 142 ("Well I gotta grab all my company email to a a .pst and make sure I have all my contacts. Sucks losing contacts").

In other words, Landsverk needed to raid all of the knowledge, expertise, talent, and financial information from IPS and use it as his own. The evidence gathered to date suggests Landsverk did all of this for personal financial gain. But irrespective of his motivations, it is unquestionable that his acts have been to the detriment, financial and otherwise, of IPS. *See* Nelson Decl. ¶ 26.

Astonishingly, Landsverk and Dyke were aware their actions were wrong and unlawful, but proceeded anyway. *See* Arnold Decl. Ex. A, rows 502-05; 982; 1341-51.

| 505 | **To:** +16517283436 Dyke Dylan | 1/17/2019 1:20:57 AM(UTC+0) | Outgoing | Yeah. I wonder if I am infecting others to think less of IPS? |
|---|---|---|---|---|

| 504 | **From:** +16517283436 Dyke Dylan | 1/17/2019 1:21:04 AM(UTC+0) | Incoming | Duh |
|------|------|------|------|------|
| 503 | **From:** +16517283436 Dyke Dylan | 1/17/2019 1:21:12 AM(UTC+0) | Incoming | Bad attitude is a plague |
| 502 | **To:** +16517283436 Dyke Dylan | 1/17/2019 1:21:36 AM(UTC+0) | Outgoing | Well I got bitter from lies |
| 982 | **To:** +16517283436 Dyke Dylan | 1/11/2019 2:52:55 AM(UTC+0) | Outgoing | Yeah that's pretty good. Should I feel bad for leaving or not? Or for stealing 2 people? |
| 1351 | **From:** +16517283436 Dyke Dylan | 1/6/2019 2:35:47 AM(UTC+0) | Incoming | Lori gonna convince Pete to sue you |
| 1349 | **To:** +16517283436 Dyke Dylan | 1/6/2019 2:36:05 AM(UTC+0) | Outgoing | Yeah maybe |
| 1348 | **To:** +16517283436 Dyke Dylan | 1/6/2019 2:36:08 AM(UTC+0) | Outgoing | Would suck |
| 1346 | **From:** +16517283436 Dyke Dylan | 1/6/2019 2:36:56 AM(UTC+0) | Incoming | Perty wortied |
| 1345 | **From:** +16517283436 Dyke Dylan | 1/6/2019 2:36:57 AM(UTC+0) | Incoming | Worried |
| 1344 | **From:** +16517283436 Dyke Dylan | 1/6/2019 2:37:51 AM(UTC+0) | Incoming | No work g.o.o.b. |
| 1343 | **From:** +16517283436 Dyke Dylan | 1/6/2019 2:38:24 AM(UTC+0) | Incoming | Eeeeeek man....just hate business plan rely on me at corval |
| 1342 | **To:** +16517283436 Dyke Dylan | 1/6/2019 2:38:39 AM(UTC+0) | Outgoing | Well yeah |
| 1341 | **To:** +16517283436 Dyke Dylan | 1/6/2019 2:39:36 AM(UTC+0) | Outgoing | Agree, but that's the only way to serve you guys properly is when we dedicated and that makes incentive for you guys to use us so you get what you want and can work with us on pricing to put you where you need to be at to win the job |

IPS is not currently aware of the full extent of the conduct of Defendants in violation of their obligations to IPS and the harm it has suffered as a consequence. To date, however, IPS has been and will continue to be irreparably harmed by Defendants' wrongful conduct, including continued breaches of valid obligations to IPS, and misuse of IPS's confidential and trade secret information. These are injuries that cannot be fully compensated monetarily, and IPS does not have an adequate remedy at law for Defendants' wrongful and unlawful conduct. Nelson Decl. ¶ 29.

## IV. Landsverk Destroys Evidence to Hide His Misconduct

On February 8, 2019, Landsverk announced his resignation of employment with IPS, effective two weeks from the date of his letter. He claimed his decision was "gut wrenching" because IPS was "like a family." Nelson Decl. Ex. B. Landsverk's resignation attempted to portray himself has being up front and honest about his activities. He offered that "[a]ll my tools, laptop, iPad, are on my desk." He also claimed the "firewall replacement has allowed the VPM serve to work as it should now." *See id.*

Unbeknownst to IPS, immediately before he resigned, Landsverk attempted to permanently delete all of the contents of his work-issued devices, including his IPS-based email account, as well as the associated IPS cloud-based storage account. He would have no legitimate reason to do so; clearly, he deleted the information on his devices so that IPS could not obtain evidence of his misconduct. But, as described above, IPS was able to recover the deleted text messages with Dyke. IPS was able to recover from Landsverk's IPS email account only seven emails dated before January 24, 2019. *See generally* Declaration of Tim McCorry.

After discovering some of the text messages between Landsverk and Dyke, IPS Owner Peter Nelson confronted Landsverk about his activities. Nelson told Landsverk that he had seen his text messages with Dyke, he accused Landsverk of stealing IPS's information, and he said that Landsverk had one opportunity to come clean. Landsverk apologized for his actions, said he knew what he had done, and said, "I'm a dumbass." Nelson also accused Landsverk of sending to Dyke IPS's confidential financial information. Landsverk admitted he had sent the information. Nelson Decl. ¶ 30. IPS then, through counsel, demanded that Landsverk immediately return to IPS all of its property and information, provide his electronic devices for further forensic inspection, reimburse IPS for its costs and fees spent investigating and remediating Landsverk's wrongdoing, and reimburse IPS for wages paid to him during his period of disloyalty. *See* Declaration of Joel O'Malley ("O'Malley Decl."), Ex. B. Landsverk, through his counsel, refused to comply with these demands, *see id.*, Ex. C, leaving IPS no option but to commence litigation.

<u>**ARGUMENT**</u>

In circumstances such as the ones of this case, the proper remedy is a TRO that fixes the status quo in place while litigation continues. *See Prudential Ins. Co. of Am. v. Sandvold*, 2012 WL 245161, at *1, *modified,* 845 F.Supp.2d 971 (D. Minn. 2012); *Randt Recycling Techs., Inc. v. Lee's Oil Serv., LLC*, 2011 WL 3610700, at *1 (D. Minn.); *Hypro, LLC v. Reser*, 2004 WL 2905321, at *1 (D. Minn.). First, traditional legal remedies are inadequate to prevent the irreparable harm IPS has and will continue to suffer if Defendants are allowed to continue their wrongful acts. Second, IPS has a

substantial likelihood of succeeding on the merits of its claims. Third, issuing a TRO advances both equity and public interest because it protects IPS's legitimate business interests and reaffirms the importance of protecting trade secrets.

## I. Defendants Should Be Temporarily Enjoined from Acting in Furtherance of Their Unlawful Conspiracy

This Court evaluates four factors to decide whether to issue a TRO: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Each *Dataphase* factor weighs heavily in IPS's favor, and IPS respectfully asks this Court to grant its motion.[2]

### A. IPS Will Likely Succeed on its Breach of the Duty Claims

In Minnesota, an employee's duty of loyalty prohibits him from soliciting the employer's customers for himself, or from otherwise competing with his employer, while employed. *Traffic Tech, Inc. v. Sarinske*, 2007 WL 2460410, at *4 (Minn. Dist.) (citing *Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 305 (Minn. App. 1987)); *see also Midwest Sports Marketing, Inc. v. Hillerich & Bradsby of Can., Ltd.*, 552 N.W.2d 254 (Minn. App. 1996); *Bellboy Seafood Corp. v. Nathanson*, 410 N.W.2d 349 (Minn. App. 1987) (finding sufficient evidence to support a jury verdict on breach of fiduciary claim because defendant used customer lists, pricing lists, and accounts receivable aging reports and solicited employer's customers before ending his employment); *Sanitary Farm*

---

[2] Pursuant to Rule 65, Defendants have been provided notice of IPS's motion, including copies of all pleadings. O'Malley Decl. Ex. D.

*Dairies, Inc. v. Wolf*, 112 N.W.2d 42 (1961) (holding employee may prepare to enter a competing business, but may not solicit employer's customers before leaving).

Relatedly, Minnesota law also proscribes a breach of fiduciary duty. All Minnesota employees, to a lesser or greater extent depending on their position, "have a fiduciary duty to act in the interests of the employer and not as an adversary." *State by McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 858 (Minn. 1985). Thus, to prevail on this claim, an employer need only show a breach of duty, causation, and damages. *Hot Stuff Foods, LLC v. Dornbach*, 726 F.Supp.2d 1038, 1043 (D. Minn. 2010). An employer can satisfy all these elements by showing it was harmed as a result of an employee's wrongful competition. *Id.*

Here, IPS is likely to succeed on both breach of duty claims. First, it is likely to succeed on its duty of loyalty claim because Landsverk not only solicited IPS's current customers, he actually conspired with one of their employees to redirect business away from IPS. While still an IPS employee, Landsverk entered into a kick-back agreement with Dyke, whereby Dyke would redirect the work IPS received or was to receive from Corval to Landsverk's newly-formed company in exchange for a financial award. Moreover, Landsverk took confidential, proprietary and trade secret information from IPS in an effort to win work bids from Corval. *See Eaton Corp. v. Giere*, 971 F.2d 136, 141 (8th Cir. 1992) (concluding breach of duty of loyalty occurred when employee appropriated trade secrets and confidential information).Without Landsverk's ability to rely on critical technical and financial data from IPS, he would not have been able to steer business away from IPS in favor of Lanix. Minnesota courts have recognized

injunctive relief is appropriate for an alleged breach of duty of loyalty. *Workers Compensation Recovery, Inc. v. Marvin*, 2004 WL 1244404 (Minn. App.); *Traffic Tech*, 2007 WL 2460410, at *4 (TRO issued when employee contacted customers before resignation to solicit their business). IPS's likelihood of succeeding on this claim supports its TRO motion.

Second, IPS is likely to succeed on its fiduciary duty claim because it can show Landsverk's decision to knowingly violate his statutory and common law duties to IPS and retain, use, and disclose IPS confidential information defied the "honesty and faithfulness to the employer" implied in every employment relationship. *See Hlubeck v. Beeler*, 9 N.W.2d 252, 254 (Minn. 1943). Moreover, evidence abounds that Landsverk's unlawful acts have caused IPS harm, including but not limited to disruption of operations, decreased business, and reputational harm. *See* Nelson Decl. ¶ 25.

## B.    IPS Will Likely Succeed on its Trade Secret Misappropriation Claims

IPS also is likely to succeed on its claim that Defendants misappropriated IPS's trade secrets and that Landsverk violated his common law duty of confidentiality. The Defend Trade Secrets Act ("DTSA") defines a trade secret generally to be scientific, technical, business, financial, or customer information that derives independent economic value from its secrecy, and which a company reasonably attempts to keep secret. *See* 18 U.S.C. § 1839(3); Minn. Stat. Ann. § 325C.01.[3] "Confidential information," in turn, has

---

[3]    Courts analyze claims under DTSA and those arising under the Minnesota Uniform Trade Secrets Act ("MUTSA") together because the statutes are functionally equivalent in key respects. *Prime Therapeutics LLC v. Beatty*, 354 F.Supp.3d 957 (D. Minn. 2018).

been defined as information that is not generally known or readily ascertainable, provides the proprietor with a demonstrable competitive advantage, was gained at expense to the employer, and was intended to be kept confidential by the employer. *Cherne Indus.*, 278 N.W.2d at 90. Confidential information need not rise to the level of a trade secret for a restrictive covenant to be enforceable. *See Saliterman v. Finney*, 361 N.W.2d 175, 178 (Minn. App. 1985). This information is precisely the type of sensitive, confidential business information that is subject to protection and immediate court action. *See, e.g.*, *Creative Comm. Consultants, Inc. v. Gaylord*, 403 N.W.2d 654, 657 (Minn. App. 1987) (noting district court grant of TRO against disclosing confidential information and affirming temporary injunction based on threat of disclosure); *see also Millard*, 790 F.Supp. at 862 (former employee irreparably harming employer because of misuse of confidential information). Actual or threatened misappropriation of a trade secret or confidential information may be enjoined. 18 U.S.C. § 1836; Minn. Stat. Ann. § 325C.02.

The information Landsverk is known to possess, *see supra*, clearly meets this criteria. *See, e.g.*, *TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*, 2013 WL 6827348, at *4 (D. Minn.) (finding allegations that products were specifically ordered by and designed for customers supported trade secrets claim); *see also Strategic Directions Group, Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002) (novel or unique combination of elements may constitute a trade secret). IPS made sufficient efforts to maintain the secrecy of this information by limiting access to its offices and computer systems and by requiring employees to use computer passwords. In fact, by virtue of his position as IT specialist, Landsverk was directly involved in some of IPS's

efforts to keep this information confidential. For instance, he frequently helped IPS transfer sensitive and confidential company data securely and purchase an insurance policy against cyberattacks.

Under the DTSA and MUTSA, current and former employees are prohibited from using or disclosing trade secrets for their personal gain. *See* 18 U.S.C. § 1832. Ample evidence shows Landsverk and Dyke conspired to steal IPS's trade secrets. And Landsverk's continued operation of Lanix threatens further acts of misappropriation. Accordingly, IPS is entitled to injunctive relief tailored to protect from such misappropriation and to discover the extent of Defendants' potential conduct with those secrets. Moreover, as noted above, courts regularly grant injunctive relief to protect confidential and trade secret information.

Because Landsverk and Lanix will use and otherwise misappropriate IPS's proprietary trade secret and confidential information to compete unlawfully against IPS, there is a strong likelihood that IPS will succeed on its DTSA and MUTSA claims.

### C.      IPS Is Likely to Succeed on Its Computer Fraud and Abuse Act Claim

The Computer Fraud and Abuse Act ("CFAA") makes it unlawful for someone to intentionally access a "protected computer" without authorization if, as a result of that conduct, the individual recklessly causes damage or causes damage and loss. 18 U.S.C. § 1030(a)(5)(B), (C). First, the statutory definition for "damage" is "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030(e)(8). Federal courts have held the statutory requirement of damage is satisfied when the defendant's acts cause the data or program's integrity to be impaired. *Int'l*

*Airport Ctrs., LLC v. Citrin*, 440 F.3d 418, 419 (7th Cir. 2006); *see also Fidlar Tech. v. LPS Real Estate Data Sols., Inc.*, 810 F.3d 1075, 1084 (7th Cir. 2016). Second, the phrase "without authorization" has been interpreted to mean that the user does not have permission to access the computer terminal at issue. *Xcedex, Inc. v. VMware, Inc.*, 2011 WL 2600688, at *4, *R&R adopted*, 2011 WL 2581754 (D. Minn.). Third, the term loss means "any reasonable costs to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Lastly, the statute defines "protected computer" as any "computer which is used in or affecting interstate or foreign commerce or communication." *Id.* § 1030(e)(2)(B). To meet this definition, it is sufficient for a plaintiff to plead that the computer in question was connected to the internet. *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007).

IPS will likely succeed on its CFAA claim because Landsverk deliberately retained access to IPS's server after he resigned and was therefore no longer authorized to access any of the IPS's terminals. Moreover, he has threatened to use such access to monitor, access, and remove IPS's trade secrets and proprietary information. In so doing, he comprised the security and integrity of IPS's computer systems and caused monetary damages by enabling him to compete with and divert business away from IPS.

**D. The Threat of Irreparable Harm and the Balance of Harms Warrants a TRO**

In cases involving misappropriated trade secrets, the potential of irreparable harm to the former employer is substantial. *Merck & Co. Inc. v. Lyon*, 941 F.Supp. 1443, 1455 (M.D.N.C. 1996) ("It is true that in most instances, courts presume irreparable harm where a trade secret has been misappropriated"); *see also CPI Card Grp., Inc. v. Dwyer*, 294 F.Supp.3d 791, 818 (D. Minn. 2018)*; McNeilus Fin., Inc. v. Dininni*, 2002 WL 31655819, at *4 (D. Minn.); *Webb Pub'g Co. v. Fosshage*, 426 N.W.2d 445 (Minn. App. 1988). This case falls squarely within this principle.

This case is not just about a former employee taking a handful of trade secrets in order to use at a competitor. Landsverk possesses IPS's entire computer server and all its electronically stored files—everything a new competitor in this business would need to get up and running, including financials, customer lists and contacts, customer purchasing histories, pricing and margins, plus all the technical and engineering tools to complete the work. Nelson Decl. ¶ 15. A TRO is warranted when an employee steal or illegally accessing a former employer's computer server. *See, e.g.*, *Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*, 2015 WL 7575925 (M.D.N.C.) ("damage that could be done to [plaintiff]'s market share and future prospects would be extremely difficult to quantify into a dollar amount).

If Landsverk is permitted to continue operating Lanix, even for a limited period, there can be no assurance he will not use IPS's confidential and trade secret information for his own gain. Even when an employee proclaims he has no intention of using

confidential information, a court need not rely on such assurance. *See Minn. Mining & Mfg. Co. v. Kirkevold*, 87 F.R.D. 324, 333 (D. Minn. 1980). It would be naïve to think Landsverk executed his months-long scheme to steal IPS's confidential information and trade secrets but does not intend to use that information in unlawful competition with IPS. In fact, Lanix—operated solely by Landsverk—has no legitimate means of doing business *but for* the usage of IPS's stolen information. Nelson Decl. ¶ 27.

By contrast, the requested TRO will not burden Defendants. It merely requires their compliance with the law for a brief period until a preliminary injunction hearing can take place. That is not injurious, particularly since Landsverk voluntarily resigned his employment with IPS. *See Thermorama, Inc. v. Buckwold*, 125 N.W.2d 844, 845 (Minn. 1964); *cf. Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 453 (Minn. App. 2001) ("Stultz voluntarily left Medtronic's employ, knowing that future employment may be subject to the noncompete agreement, thus creating the current situation."). As for Dyke, he will suffer no appreciable harm in being unable to do business with Lanix, one of several companies in this industry.

For these reasons, the balance of the harms favors IPS, and a TRO is appropriate.

### E.     Other Factors Support Issuance of a TRO

Courts typically place the most weight on the balance of harms and likelihood of success on the merits in evaluating requests for temporary injunctive relief. Here, the other relevant factors further confirm that a TRO is appropriate and necessary.

Landsverk was in close contact with many IPS customers. *See Medtronic*, 630 N.W.2d at 452 (when employee received customer contacts in employment, prior

relationship between employee and former employer favored granting injunctive relief). Moreover, as a former employee with access to confidential information, the parties' relationship supports a TRO. *See Cook Sign*, 2008 WL 3898267, at *5 (affirming TRO when nature of parties' relationship was based on "a valuable employee in a specialized business, who had access to [plaintiff]'s confidential, proprietary, and trade-secret information . . . [, which] would be harmful to [plaintiff] if disclosed to a competitor"); *Medtronic*, 630 N.W.2d at 451 ("[B]ecause Stultz signed the employment contract 'of his own free will' and received both training and customer contacts from his employment with Medtronic, this factor favors granting injunctive relief."); *see also Commodities Specialists Co. v. Brummet*, 2002 WL 31898166, at *7 (D. Minn.).

A significant public interest is present here, to the extent Defendants are acting in violation of their statutory and common law obligations to IPS. The public has an interest in seeing such unlawful conduct enjoined. *See Hood Packaging Corp. v. Steinwagner*, 2014 WL 4436105, at *7 (D. Minn.); *Klick v. Crosstown State Bank of Ham Lake, Inc.,* 372 N.W.2d 85, 86 (Minn. App. 1985); *Langeland v. Farmers State Bank of Trimont,* 319 N.W.2d 26, 32 (Minn. 1982). Additionally, Landsverk served as one of the employees principally responsible for IPS's computer systems and their security. As such, he held a position with particular responsibilities and IPS placed a great amount of trust in him. And yet, Landsverk blatantly abused that trust and those responsibilities for personal gain.

No administrative burdens are implicated by enforcing the relief requested. IPS is simply requesting that Defendants be temporarily stopped from misusing IPS's

confidential and trade secret information. IPS offers to supervise any injunctive relief that the Court deems necessary to grant, which will "alleviate any administrative burdens placed on it." *Softchoice, Inc. v. Schmidt*, 763 N.W.2d 660, 669 (Minn. App. 2009) (affirming district court determination that administrative burden involved in supervising temporary injunction would be minimal because movant offered to supervise any injunctive relief granted); *Cook Sign*, 2008 WL 3898267, at *8 (limited administrative burden in granting temporary injunction to enforce noncompetition agreement).

Because all relevant factors favor issuance of a TRO, this Court should act to protect IPS, at little or no harm to Defendants.[4]

## II.     Good Cause Exists to Order IPS's Narrow Expedited Discovery Requests

Federal courts have broad power to permit expedited discovery in appropriate cases for "good cause." *See* Fed. R. Civ. P. 26(d)(1), 30(a)(2)(A)(iii), 33(a)(1), 34(b)(2)(A); *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 275-76 (N.D.

---

[4]   Although security is a condition for injunctive relief, the Court only need order the giving of security "in an amount that the court considers proper." Fed. R. Civ. P. 65. Because the requirement of security bond is limited only to those damages that might be incurred by Defendants as a proximate result of an improperly granted injunction, when, as here, there is no evidence any harm would be caused by an improvident restraining order, no bond is necessary. *See Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974); *McLeodUSA Telecomms. Servs., Inc. v. Qwest Corp.*, 361 F.Supp.2d 912, 924 (N.D. Iowa 2005). When the person to be enjoined would suffer no harm, a waiver of the bond requirement is appropriate. *See, e.g.*, *Heather K. v. City of Mallard*, 887 F.Supp. 1249, 1268 (N.D. Iowa 1995) (because "virtually no possibility of a risk of financial harm to the party to be enjoined" no bond required). If any bond is required, a nominal one should suffice. *Webb Publ'g Co. v. Fosshage*, 426 N.W.2d 445, 451 (Minn. App. 1988) (finding $2,000 bond sufficient).

Cal. 2002).[5] Good cause may be found when "the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* at 276; *see also Gillman v. Sprint Comm. Co.*, 2002 WL 31497311 (Utah) (ordering expedited discovery to "prevent alleged continuing harm to plaintiff and others and to minimize the defendant's liquidated damages"). Expedited discovery is especially appropriate when "the moving party has asserted claims of . . . unfair competition" and is necessary to bring a well-supported temporary injunction motion. *Qwest Comm. Int'l, Inc. v. WorldQuest Networks, Inc.*, 213 F.R.D. 418, 419 (D. Colo. 2003); *see also Semitool*, 208 F.R.D. at 276; *Hormel Healthlabs, Inc. v. Ventura Foods LLC*, 2004 WL 2526423, at *1 (D. Minn.) (expedited discovery ordered in misappropriation case); *H&R Block Enters., Inc. v. Short*, 2006 WL 640508, at *4 (D. Minn.) (same); *Traffic Tech*, 2007 WL 2460409, at *1 (expedited discovery ordered in duty of loyalty case).

Good cause exists for expedited discovery here. First, good cause exists when, as here, the Complaint alleges unfair competition because this claim necessarily involves irreparable harm. *Semitool,* 208 F.R.D. at 276. Second, good cause exists because a TRO is necessary to stop Defendants from using or disclosing the confidential information and trade secrets that Landsverk stole, and from stopping Defendants from further unfair

---

5 The Advisory Committee Notes to Rule 26(d) note that "[d]iscovery can begin earlier if authorized" by court order and specifically note that "[t]his will be appropriate in some cases, such as those involving requests for preliminary injunction." *Id.* (1993 am.). Expedited discovery is helpful for the development of the record before a preliminary injunction hearing. *See, e.g.*, *Edudata Corp. v. Scientific Comps., Inc.*, 599 F.Supp. 1084, 1088 (D. Minn. 1984) ("further development of the record before the preliminary injunction hearing will better enable the court to judge the parties' interests and respective chances for success on the merits").

competition against IPS. *See Qwest Comm. Int'l*, 213 F.R.D. at 419. IPS needs this discovery promptly to be able to bring a well-supported preliminary injunction motion as soon as possible.

Third, IPS's discovery requests are narrowly tailored (just six interrogatories and six document requests, *see* O'Malley Decl. Ex. A) to uncover the extent of Defendants' misconduct warranting the imposition of injunctive relief to avoid IPS from suffering irreparable harm, particularly given the evidence of Landsverk trying to hide his misbehavior and his intentional efforts to destroy evidence on his computer and smart phone. *See Semitool*, 208 F.R.D. at 277; *Qwest Comm. Int'l*, 213 F.R.D. at 419. The limited discovery greatly outweighs any prejudice to Defendants. Currently, IPS has only limited knowledge of the full extent of Defendants' planned activities and misuse of IPS's confidential information. Given the unapologetic nature of Landsverk's and Dyke's actions to date, IPS reasonably believes that the evidence of misconduct it has uncovered thus far is just the "tip of the iceberg." Expedited discovery will afford IPS a more meaningful opportunity to address the substantial and potential harm to its business it is likely to suffer if Defendants are permitted to continue with their unlawful scheme. Permitting expedited discovery will simply give IPS and the Court the opportunity to learn this crucial information.

IPS requests that the Court grant this motion for expedited discovery and require each Defendant to (1) provide written responses to the interrogatories and document requests no later than seven calendar days following entry of an expedited discovery order; (2) subject to good faith objections, produce documents requested by IPS no later

than seven calendar days following entry of the expedited discovery order; and (3) appear for deposition at the office of Nilan Johnson Lewis PA on a mutually convenient date, but no later than fourteen calendar days from the date of the expedited discovery order.

## III. Defendants Must Preserve All Potentially Relevant Evidence

Finally, IPS requests an order requiring Defendants to immediately preserve all evidence potentially relevant to the issues and claims in this case. *E\*Trade Sec. LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 588 (D. Minn. 2005) ("The obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation."). As discussed *supra*, one purpose of a TRO is to provide the movant an opportunity to conduct expedited discovery to present to the Court a well-supported permanent injunction motion. The TRO serves that function only if relevant evidence is preserved. There is already ample evidence of Landsverk intentionally destroying evidence of his bad acts. For these reasons, IPS respectfully requests that the Court order Defendants to preserve all evidence relating to this case and, in particular, any emails, text messages, and other electronically stored documents, data, or files from any device in their possession, custody, or control.

## CONCLUSION

The Court should issue an order temporarily restraining Defendants from further violations of their statutory and common law duties to IPS, and an order for expedited discovery and to preserve evidence. The relief IPS seeks is factually supported, legally warranted, and narrowly tailored.

NILAN JOHNSON LEWIS PA

Dated: March 7, 2019            By:    */s/ Joel O'Malley*      
                               Joel O'Malley (Reg. No. 0352573)
                               Pablo Orozco (Reg. No. 0396811)
                               120 South Sixth Street, Suite 400
                               Minneapolis, MN 55402
                               Phone: 612-305-7500
                               Fax: 612-305-7501
                               jomalley@nilanjohnson.com
                               porozco@nilanjohnson.com

                               ATTORNEYS FOR PLAINTIFF