Integrated Process Solutions, Inc.,

                                                                   Court File: 19-CV-00567
                                                                           Hon. Nancy E. Brasel

                Plaintiff,

vs.

Lanix, LLC, Kevin Landsverk, and
Dylan Dyke,

                Defendants.

_____

**OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**
_____

Defendants, Lanix, LLC, Kevin Landsverk, and Dylan Dyke respectfully submit the following Memorandum of Law in support of their opposition to Plaintiff Integrated Process Solutions, Inc.'s motion for temporary restraining order.

**I.    INTRODUCTION**

Kevin Landsverk ("Landsverk") is a former employee of Integrated Process Solutions, Inc. ("IPS"). He was not happy with how IPS was treating him. IPS had promised him raises, bonuses and commissions on projects that he helped sell, but never followed through on these promises. As he considered his options, he thought of starting his own small company through which he could do work on his own, and formed a company called Lanix, LLC. He is the sole owner of Lanix.

On February 8, 2019, Landsverk gave notice to IPS that he was leaving. He worked to finish up his projects at IPS and transition his work through February 11, 2019, his last day of employment. Landsverk did not have any written agreement with IPS that restricted the work he could do after he left IPS.

Landsverk set up Lanix to focus on a very small niche market - controls for Industrial Refrigeration including the use of Ammonia as the refrigerant. While he did some of this work at IPS, IPS did not market this work as it focused on industrial municipal operators of water and waste-water systems.

Following his termination of employment, IPS reviewed text messages on Landsverk IPS work phone. These text messages were with one of his best friends, Defendant Dylan Dyke ("Dyke"). Some of the texts quoted by IPS create the appearance that Landsverk took IPS information. However, he did not.

Despite receiving written assurances from Landsverk on March 6, 2019 that he never copied data from the backup server and has no copies of any such data other than the hard drives he has agreed to return, he has not used any IPS information for competitive purposes or otherwise, and, while he intends to keep working with Corval, he will not solicit any other IPS customer to provide the same or similar services IPS provides for a period of one year; IPS filed this law suit which is a huge fishing expedition and waste of time and money. IPS includes Dyke as a defendant despite the fact that he has no contractual relationship with IPS and there is no evidence he received any IPS information that IPS did not disclose to his employer, Corval Group, who could use the information as it saw fit.

The reality is that IPS' purported trade secret information is available to its customers like Corval and the end users of PLCs. For example, once Corval buys a PLC from IPS, all information related to the PLC is available to Corval and its customer where the PLC is installed and the program used to run the PLC can be downloaded by anyone with access to the PLC. This is specifically why Corval requires its integrators use Allen Bradley which is basically open source software that allows the program and its operator interface to be downloaded, changed, and uploaded by any person who has an Allen Bradley license.

The further reality is that IPS has suffered no harm, let alone irreparable harm to support its motion. Lanix is not a "rival." IPS has made no attempt to solicit the limited work that Lanix has received from Corval.

Accordingly, there is absolutely no basis for the extraordinary relief that IPS seeks.

## II. RESPONSE TO FACTUAL BACKGROUND

### A. IPS Business.

1. <u>IPS does not focus on PLCs for Industrial Refrigeration including the use of Ammonia as the refrigerant.</u>

IPS designs and builds integrated electrical control systems which are also called programmable logic controllers ("PLC"). As stated in IPS' Complaint, IPS focuses its service on "industrial municipal operators of water and waste-water systems". (Complaint ¶10). IPS does not specifically identify or market that they provide controls for Industrial Refrigeration including the use of Ammonia as the refrigerant. (Landsverk

Dec., ¶4). In other words, IPS did not focus on the small niche market of controls for Industrial Refrigeration including the use of Ammonia as the refrigerant when Landsverk was there; and has made no effort to go after business in that market by hiring persons with that experience. In fact, since Landsverk gave notice on February 8, 2019, IPS has made no effort to contact Corval about doing that work for Corval. (Dyke Dec., ¶18).

      2.    <u>IPS' relationship with Corval.</u>

Dyke has known Landsverk since 2005 when they met in college and they have been close friends ever since. (Dyke Dec. ¶4; Landsverk Dec. ¶11). Dyke introduced Landsverk to Corval when Kevin Landsverk was working at IPS. Dyke knew that Kevin had some experience with PLCs for Industrial Refrigeration Systems using ammonia as the refrigerant because he had previously worked with him. IPS began biding on some Corval projects and Dyke recommended IPS for some of those jobs based upon Landsverk managing the project. (*Id.*).

Corval is a general contractor that would buy a PLC from IPS that would be used in a project for a Corval customer (the end user). The Corval customer then owns the PLC. (Dyke Dec. ¶15).

When IPS did work for Corval, it submitted a bid and, if the bid was successful and IPS was awarded the work, IPS would acknowledge Corval's standard purchase order for the work. There were no other written agreements or terms between Corval and IPS. (Dyke Dec. ¶7). IPS would share information with Dyke regarding its design and build process for PLCs including: drawings, programing information, and other design information. IPS never asked Dyke or Corval to sign any type of non-disclosure

agreement with regard to this information. This did not surprise Dyke because Corval required that integrators like IPS that it worked with to use Allen Bradley programming software. The reason for this was that Corval and/or its customers could use any integrator to work on the PLCs it received because the Allen Bradley software was for sale to the public. (Dyke Dec. ¶8).

IPS, its owner, or its employees have never contacted Dyke since Landsverk left to ask about or bid work for Corval. IPS has never contacted Corval regarding who would be replacing Landsverk or has the skill set to continue to work on or for Corval and its needs for an Industrial Refrigeration Integrator. (Dyke Dec. ¶18).

### B. Landsverk's Employment at IPS

Landsverk began work for IPS on June 17, 2013. He did not have a written employment agreement. He just received an offer letter with basic information about his salary and benefits. He was never asked to sign a confidentiality agreement or non-compete agreement and he is not aware of other employees having to sign such agreements. (Landsverk Dec., ¶2).

During his employment with IPS, Landsverk had many duties. At the time of his termination, he was working as an IT Specialist and Project Manager. Landsverk gave his two-week notice on February 8, 2019. Even though he was willing to stay longer, Landsverk's last day of employment with IPS was February 11, 2019. Contrary to the allegations in the Complaint, during the final two weeks of his employment with IPS, Landsverk worked to complete and/or transition the following projects: J001322 - Dold PCBE - remote startup services; J001386 - Shorewood - factory testing; J001414 -

5

Bellisio SSHE - remote startup services; IT support assisting IPS personnel setting up their VPN. (Landsverk Dec., ¶17).

### C. The Alleged Conspiracy

Following his termination of employment, IPS reviewed text messages between Dyke and Landsverk on Landsverk's IPS work phone he returned. Some of the texts quoted by IPS could create the appearance that Landsverk took IPS information. However, he did not.

#### 1. Alleged Kickback Scheme.

The reality is that Landsverk never paid Dyke anything. Dyke has no ownership interest in Lanix and he and Landsverk have no agreement to pay him a referral fee or kickback. Dyke cannot accept any such payment while he works for Corval. Moreover, this allegation of an "illegal" kickback scheme is disingenuous as Mr. Nelson had instructed Landsverk to offer Dyke payments to get work. (Landsverk Dec., ¶15).

#### 2. The Backup Server

During Landsverk's employment at IPS, he was asked to, and did, set up a back-up server at his home. This was a redundancy to protect IPS in the event its server went down. At IPS, no one works locally on a computer. IPS employees work directly off the server or through "OwnCloud" which is a virtual document system like drop box that is synched to the IPS server. (Landsverk Dec., ¶18).

When he gave his notice, Peter Nelson asked Landsverk to maintain the back-up server. On February 14, 2019, Mr. Nelson contacted Landsverk and was upset and made threats. As a result, Landsverk shut down the back-up server at his house. Landsverk

maintained all the electronic information from the back-up server on hard drives and told Mr. Nelson that he could make arrangements to pick them up or send someone out to Landsverk's house to monitor erasing the data. Mr. Nelson never made arrangements to pick them up or directed Landsverk to send the hard drives anywhere. It was not until March 11, 2019 that counsel for IPS ask that Landsverk deliver the hard drives to: Bryan Behrendt, Discovery Consultant, XACT DATA DISCOVERY, 733 Marquette Ave South, Suite 125, Minneapolis, Minnesota 55402, which Landsverk did on March 13, 2019. (Landsverk Dec., ¶19).

While Landsverk bragged about having multiple routes back into IPS' server. This is referring to three backup domain administrator accounts on the domain controller. When Landsverk learned that IPS no longer wanted him to maintain the backup server, he called Peter Nelson and told him about the backup domain administrator accounts. He also texted him the passwords for the accounts so that he could change these accounts and Landsverk would no longer have access. (Landsverk Dec., ¶20).

3. Alleged Trade Secrets

IPS accuses Landsverk of taking Autocad files. Landsverk did not take Autocad files. Landsverk bought Autocad LT, a very simple version of Autocad, and the software he needed to program PLCs, which he could get through an Allen Bradley license. Landsverk uses those tools to draw designs and program PLCs. (Landsverk Dec., ¶27).

IPS would share information with Corval regarding its design and build process for PLCs including: drawings, programing information, and other design information. IPS never asked Dyke or Corval to sign any type of non-disclosure agreement with regard

7

to this information. This did not surprise Dyke because Corval required that integrators like IPS that it worked with to use Allen Bradley programming software. The reason for this was that Corval and/or its customers could use any integrator to work on the PLCs it received because the Allen Bradley software was for sale to the public. (Dyke Dec., ¶8).

Landsverk did not steal financial information. He sent Dyke one Excel spread sheet that had the revenue for the Dold project for 2018 listed on it. He sent the information to show he was not getting a bonus despite IPS getting a lot of revenue from that project he brought in. Obviously, because it was a Corval project, Dyke could see how much Corval paid IPS on that project. (Landsverk Dec., ¶22).

### D. The Alleged Spoliation

Lansverk reset his IPS computer. He did this because it was what he had been instructed to do with other employee computers when they left and thought he was following company policy by getting the computer ready for someone else to use. Any information on Landsverk's IPS computer should be copied on the IPS server. (Landsverk Dec., ¶21).

### III. ARGUMENT

The Court is familiar with the factors set forth in *Dataphase Sys., Inc. v. C L Sys., Inc*. 640 F.2d 109 (8th Cir. 1981). IPS cannot meet it is burden of proof under *Dataphase*.

I.  IPS Has Not, And Cannot, Establish Irreparable Harm.

A temporary restraining order or injunction is an extraordinary equitable remedy and IPS must offer specific facts demonstrating irreparable harm before injunctive relief may issue. IPS has not submitted evidence of specific facts establishing irreparable harm.

*First*, IPS alleges that Landsverk is attempting to start a rival company. However, the evidence shows that Landsverk is simply working on his own and focusing on a very small niche market - controls for Industrial Refrigeration including the use of Ammonia as the refrigerant. IPS focuses its service on "industrial municipal operators of water and waste-water systems". IPS does not specifically identify or market that they provide controls for Industrial Refrigeration including the use of Ammonia as the refrigerant. Moreover, IPS has never contacted Corval to try and continue work in this area.

*Second*, IPS asks the Court to "infer" irreparable harm based upon an alleged misappropriation of a trade secret. For the reasons discussed below, IPS cannot establish all the elements of its misappropriation of trade secret claim. Accordingly, the court may not infer irreparable harm on that basis.

*Third*, IPS is attempting to create a restrictive covenant where none exists. IPS is asking this court to stop Landsverk from working at Lanix, and thus, is trying to create a non-compete where none exists. It is important to remember that restrictive covenants are disfavored by Minnesota law and strictly construed against the employer. *Freeman v. Duluth Clinic Ltd.*, 334 N.W.2d 626, 630 (Minn. 1983); *National Recruiters Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982); *Jim W. Miller Construction, Inc. v.*

*Schaefer*, 298 N.W.2d 455, 458 (Minn. 1980); *Bennett v. Storz Broadcasting Co.,* 134 N.W.2d 892, 898 (Minn. 1965).

Finally, IPS makes no showing as to why money damages would not be sufficient if it were to prevail on any of its claims.

II. <u>IPS Has Not Established a Likelihood of Success on the Merits</u>.

a. Duty of Loyalty

IPS' duty of loyalty claim is essentially a repackaging of its misappropriation of trade secrets claim. In *Superior Edge, Inc. v. Monsanto Co.,* the Minnesota federal district court denied a motion to dismiss a claim under the MUTSA and granted a motion to dismiss a conversion claim when "there [was] no information that [plaintiff] allege[d] was converted that it [did] not also allege is a trade secret." 964 F.Supp.2d 1017, 1039–40 (D.Minn.2013); *see also SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC,* 292 F.Supp.2d 1175 (D.Minn.2003) (denying rule–12 motion to dismiss claim under the MUTSA and granting motion to dismiss common-law conversion and tortious-interference claims when common-law claims alleged nothing more than misappropriation of trade secrets). The common-law claims asserted by IPS, are all based on information IPS claims as a trade secret. As in *Monsanto* and *SL Montevideo,* IPS identifies no information that is confidential and proprietary that differs from the information claimed to be a trade secret. Accordingly, the Court IPS' common-law claims for Breach of Duty of Loyalty, Unjust Enrichment and Civil Conspiracy are subject to a motion to dismiss.

Moreover, an employee may prepare to leave a company while an employee and not breach his duty of loyalty. That is all that Landsverk did. He did not submit a bid to Corval until after he terminated his employment. Although he may have had some discussions with Dyke about the potential for work at Corval, Dyke did not have authority to award Landsverk work which would have to go through a bid process. Thus, Landsverk did not breach any duty of loyalty he may have had to IPS.

      b. Misappropriation of Trade Secrets

To prevail on a claim under the Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01–.08 (2014), IPS must show both the existence and misappropriation of a trade secret. *Electro–Craft Corp. v. Controlled Motion, Inc.,* 332 N.W.2d 890, 897 (Minn.1983). The act defines a trade secret as information that (1) is not generally known or readily ascertainable; (2) derives independent economic value from secrecy; and (3) is the subject of efforts that are reasonable under the circumstances to maintain secrecy. Minn. Stat. § 325C.01, subd. 5(i), (ii); *Electro–Craft Corp.,* 332 N.W.2d at 899–901. If an employee acquires a trade secret without express notice that it is a trade secret, then the employee must know or have reason to know that the owner expects secrecy. Minn. Stat. § 325C.01, subd. 5. IPS cannot prove each of these elements.

        i. IPS has not identified trade secrets

IPS alleged trade secrets falls into three categories: 1) Customer information; 2) its bidding process; and 3) software programming and other IPS designed control codes. None of this information arises to the level of a trade secret.

Customer information like customer-lead lists are generally not trade secrets. *See Blackburn, Nickels & Smith, Inc. v. Erickson,* 366 N .W.2d 640, 645 (Minn.App.1985) (holding that a customer list did not constitute a trade secret because "[i]t could be easily duplicated from public sources"), *review denied* (Minn. June 24, 1985). The information contained in customer-lead lists is often "readily ascertainable by proper means" over the course of time without efforts beyond those ordinarily exerted by salesmen in developing customers." *Fleming Sales Co. v. Bailey,* 611 F.Supp. 507, 514 (N.D.Ill.1985). Information regarding IPS' customers and its sales to customers is readily ascertainable by proper means.

IPS' bidding information is made available to its customers without any requirement that they not share it. Moreover, the majority of IPS bids are public information because they bid on public projects. Thus, bidding information does not meet the definition of a trade secret.

IPS' software programming and other IPS designed control codes are not a trade secret because IPS provides the information to its customers and is required to use open-source software. IPS does not require that its customers license its purported proprietary software programming and other IPS designed control codes or otherwise enters into agreements with its customers preserving any rights IPS may have in proprietary information. IPS simply acknowledges the customer purchase order. The reality is that

IPS customers could use any integrator to work on PLCs bought from IPS because the Allen Bradley software was for sale to the public and the customer owns the design for the PLC.

        ii. IPS did not take reasonable steps to protect its alleged trade secrets.

IPS argues it took reasonable steps to protect its alleged trade secrets by "limiting access to its offices" and "requiring employees to use passwords." However, conspicuously absent from IPS' submissions is any evidence limiting employees to information based upon a need to know basis; implementing written policies on computer usage or confidential information; or marking information as confidential. Moreover, the undisputed evidence is that IPS did not require their employees or customers to sign any sort of document that protected the confidentiality of information provided to them by IPS.

        iii. There is no evidence of misappropriation

IPS has no evidence that either Defendant "misappropriated" any trade secret. All that has been shown is that Landsverk had access to information while employed. Other than that, IPS' entire argument is based upon speculation because of the text messages between Dyke and Landsverk.

    c. Computer Fraud and Abuse Act

IPS is not likely to succeed on this claim. *First*, there is no evidence that Landsverk accessed any IPS computer at a time when he did not have authorization. The CFAA does not include any definitions of the terms "access" or "without authorization."

The CFAA defines "exceeds authorized access," as meaning "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter." 18 U.S.C. 1030(e)(6). The lack of a statutory definition of what qualifies as "access," or accessing a computer "without authorization," however, has created a split between the Circuits of the U.S. Court of Appeals over what actions by an employee qualify as exceeding authorized access under the CFAA.

The First, Fifth, Seventh, and Eleventh Circuits of the U.S. Court of Appeals broadly read the CFAA as covering employees who misuse data obtained from an employer-provided computer—even when the employee was authorized to obtain data from the employer's computer. As a general rule, these courts focus on the employer's computer use policies and the intended use of the data by the employee as significant factors when determining whether the CFAA covers the employee's complained of access and use of data from the employer's computers. See *United States v. Rodriguez*, 628 F.3d 1258, 1263 (11th Cir. 2010), cert. denied, 563 U.S. 966 (2011) *United States v. John*, 597 F.3d 263, 272 (5th Cir. 2010), cert. denied, 568 U.S. 1163 (2013); *Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 420-21 (7th Cir. 2006); and *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581-84 (1st Cir. 2001).

The Fourth and Ninth Circuits—and arguably the Second Circuit—however, narrowly interpret the CFAA as focused on whether the employee's access to an employer's computer was authorized and disregard or downplay the misuse analysis. See *United States v. Valle*, 807 F.3d 508, 526-28 (2nd Cir. 2015); *WEC Carolina Energy*

*Solutions LLC v. Miller*, 687 F.3d 199, 203-07 (4th Cir. 2012); and *LVRC Holdings L.L.C. v. Brekka*, 581 F.3d 1127, 1135 (9th Cir. 2009).

Defendants submit that this court should follow the more narrow interpretation. However, under either interpretation there is no evidence that Landsverk accessed any IPS computer when he did not have authorization to access it or that he misused it. All IPS submits is speculation.

IPS argues that "Landsverk deliberately retained access to IPS' server after he resigned and no longer had authorization. However, this is not true. When Landsverk gave notice, Peter Nelson asked him to maintain the back-up server. On February 14, 2019, Mr. Nelson contacted Landsverk and was upset and made threats. As a result, Landsverk shut down the back-up server at his house; maintained all the electronic information from the back-up server on hard drives; and told Mr. Nelson that he could make arrangements to pick them up or send someone out to his house to monitor erasing the data. Mr. Nelson never made arrangements to pick them up or directed Landsverk to send the hard drives anywhere. It was not until March 11, 2019, ***almost one month later***, that counsel for IPS ask that Landsverk deliver the hard drives to: Bryan Behrendt, Discovery Consultant, XACT DATA DISCOVERY, 733 Marquette Ave South, Suite 125, Minneapolis, Minnesota 55402, which I did not March 13, 2019.

In addition, while Landsverk may have bragged, while employed, about having multiple routes back into IPS' server, he was referring to three backup domain administrator accounts on the domain controller. When Landsverk learned that IPS no longer wanted him to maintain the backup server, he called Peter Nelson and told him

15

about the backup domain administrator accounts. He also texted him the passwords for the accounts so that he could change these accounts and Landsverk would no longer have access.

Accordingly, there is no evidence that Landsverk accessed an IPS computer when not authorized.

III. The Balance of Harms Weigh in Favor of Landsverk.

IPS seeks to prevent Landsverk from working in the industry where he has acquired his own personal experience and skill. This is improper. See, *Jim W. Miller Cons. Inc. v. Schaefer*, 298 N.W.2d 455 (1980); See, *FSI International, Inc. v. Shumway*, 2002 WL 334409 (D. Minn.). This is especially so when the evidence establishes that IPS is not working the PLC for Industrial Refrigeration niche, has not written agreement with Landsverk that includes a restrictive covenant, and must acknowledge that the tools used by Landsverk are publically available. Thus, there is no threat or harm to IPS purported confidential information goodwill.

IV. Public Policy Favors Denying the Injunction.

In Minnesota, restrictive covenants and non-competition agreements are disfavored by the law as partial restraints of trade which are strictly construed against the employer and in favor of the employee. *Freeman v. Duluth Clinic Ltd*., 334 N.W.2d 626, 630 (Minn. 1983); *National Recruiters Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982); *Jim W. Miller Construction, Inc. v. Schaefer*, 298 N.W.2d 455, 458 (Minn. 1980); *Bennett v. Storz Broadcasting Co*., 134 N.W.2d 892, 898 (Minn. 1965). While no

restrictive covenant or non-competition agreement exists in this case, IPS is seeking the same result. Thus, public policy supports denying the injunction.

V. Expedited Discovery is Unnecessary and Overbroad.

There is no need for expedited discovery. There is no unfair competition going on. Lanix is not a "rival" of IPS. IPS is not even trying to get work from Corval. Landsverk has no intent of soliciting IPS customers and there is no evidence that he has solicited any IPS customers other than Corval.

Moreover, the requested discovery is not proportional to the needs of this case. The total amount of purchase orders awarded to Lanix is approximately $64,300.00. The amount of money at issue in this case does not warrant the retention of third party computer forensic experts, written discovery in a week, multiple depositions, etc… This is especially so because Landsverk has returned all IPS information and assured them that he has not, and will not, use any IPS information.

However, if the court is inclined to order expedited discovery, Defendants should have the opportunity to propound interrogatories and requests for production and take a Rule 30(b)(6) deposition of IPS.

**MORRISON SUND PLLC**

Dated: March 13, 2019

/s/ Scott S. Payzant
By_____
Scott S. Payzant, #255907
5125 County Road 101, Suite 200
Minnetonka, MN 55345
(952) 975-0050
*spayzant@morrisonsund.com*

**ATTORNEYS FOR DEFENDANTS**