UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Integrated Process Solutions, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> Lanix LLC, Kevin Landsverk, and Dylan Dyke, <br><br> Defendants. | Court File No.: 19-cv-00567 <br> Hon. Nancy E. Brasel <br><br> **PLAINTIFF'S <u>REPLY</u> MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER, EXPEDITED DISCOVERY, AND PRESERVATION OF EVIDENCE** |

Defendants' opposition to IPS's motion for TRO seeks to sidestep damning evidence against them, putting it off as merely texting between friends. But the proof of a conspiratorial scheme between friends to steal business opportunities from IPS, perform the work using IPS's confidential information and trade secrets, and wipe the electronic fingerprints of their wrongdoing is unmistakable. IPS has submitted ample evidence supporting entry of a TRO.

### A. Landsverk and Dyke withheld Corval purchase orders from IPS in order to give them to Lanix.

Defendants try to turn this case into a miscast non-compete dispute.[1] They ignore the substantial evidence of Landsverk and Dyke secretly conspiring *while Landsverk was still employed at IPS* to withhold Corval purchase orders that should have gone to IPS, sit

---

[1] Defendants site a slew of non-compete cases in their argument why IPS is not suffering irreparable harm. *See* Oppos. Mem. at 9-10. IPS is not moving to enforce a non-compete agreement, so those cases are inapposite.

4829-1696-6283.1

on them until Lanix could start operating (using IPS's information), then steer those orders to Lanix for Landsverk's and Dyke's personal gain.[2]

- About two months before Landsverk quit, Dyke told him: "So would have to have a decent PO ready to go and get some of it up front in order to make it work." Nelson Suppl. Decl. ¶ 11, row 2053.

- A few weeks later when discussing a potential piece of work, Landsverk told Dyke: "That's a good amount for Lanix! Doesn't do much for IPS." Dyke responded: "It's small but it's how we start." *Id*. rows 1553-57.

- A few days later, Dyke wrote: "But anyway, when is the transition? . . . I can't hold POs too long unless you start working off record for any other new ones." *Id*. row 1426.

- About a month before Landsverk quit, Dyke went further: "I'll hold all other POs to IP[S], you can work on those on your own before POs at Lanix." Landsverk responded: "Ok, that gives me more time to setup company too then." Arnold Decl. Ex. A rows 1199-1200.

- And just a few weeks later when discussing some new work, Dyke told Landsverk: "Waiting for Lanix….." *Id*. row 276.

Defendants freely admit Corval has now issued those purchase orders to Lanix, so far totaling nearly $75,000. *See* Landsverk Decl. ¶ 24; Dyke Decl. ¶ 19. They also admit

---

[2] In this regard, IPS's common law claims go far beyond protection of trade secrets, so Defendants' preemption arguments miss the mark. *See* Oppos. Mem. at 10. Defendants cite *Superior Edge, Inc. v. Monsanto Co.*, 964 F.Supp.2d 1017 (D. Minn. 2013), which held MUTSA preempted a conversion claim; IPS has not asserted a conversion claim. They also cite *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F.Supp.2d 1175 (D. Minn. 2003), but that case dismissed common law claims that alleged only trade secret misappropriation; IPS's common law claims allege much more. *See Cardiac Pacemakers, Inc. v. Aspen II Holding Co.*, 413 F.Supp.2d 1016, 1024 (D. Minn. 2006) (rejecting MUTSA preemption argument, noting plaintiff's tortious interference claim "rests on different factual and legal grounds than Guidant's trade secrets claim").

those orders were on "Lamb Weston" projects and a "Jennie-O Contherms" project. Landsverk Decl. ¶¶ 24-26. What Defendants omit from their statements—but which IPS already explained in its opening memorandum—is that (1) the Lamb Weston projects were supposed to be performed by IPS, but Defendants conspired to cancel the project with IPS, lie about the reason for the cancellation, then have Lanix jump in after Landsverk quit IPS; and (2) the Contherms project was supposed to go to IPS, but again was withheld so it could go to Lanix. *See* Arnold Decl. Ex. A rows 130, 147, 156-61; 276-84.

Dyke now asserts he had no authority to steer Corval work to Lanix. Dyke Decl. ¶¶ 12, 17. As shown above, Dyke's texts—all sent before this litigation was initiated (and he hired an attorney)—tell the real story. Dyke also incredibly claims he was "concerned" when "it appeared that Kevin might leave IPS." *Id*. ¶ 11. Again, Dyke's texts say otherwise. Dyke repeatedly encouraged Landsverk to leave IPS because it would benefit Dyke personally, going so far as to propose the financial terms Dyke expected in return for his withholding purchase orders, coach Landsverk on the specific steps he should take to leave IPS while maintaining access to IPS's information, and help draft his resignation letter.

### B.  The information Landsverk retained warrants trade secret protection.

Defendants are wrong that IPS has not protected or identified its trade secrets.

First, Defendants argue IPS did not do enough to protect its trade secrets, pointing to the absence of a company confidentiality policy. *See* Oppos. Mem. at 13. Courts do not require such a policy for trade secret protection to apply; rather, the test is whether a company took reasonable protective measures under the circumstances. *See, e.g.*, *Wyeth*

3

*v. Natural Biologics, Inc.*, 395 F.3d 897, 899-900 (8th Cir. 2005). As previously described, IPS has taken reasonable protective measures.

Second, it is not true that IPS's bidding information is publicly available because its customers receive the bids. *See* Oppos. Mem. at 12. IPS's bids sent to customers generally state lump sum pricing amounts; they do not detail specific parts, costs, programming details, and other information underlying the bids. Landsverk retained all this information, which would be invaluable to a new company seeking to compete with IPS because it would give them the information they need to execute the bid. Nelson Suppl. Decl. ¶ 4. If the competitor had only the end pricing that a customer receives, it would be left to try to build the bid to comport with the pricing—a difficult feat for a new market entrant considering all the components that go into forming the bid itself.

Third, IPS protects its corporate financial information from disclosure and does not share it outside a select group of employees. Landsverk, solely as a result of his special status as an IT professional, had administrative rights to the computer folders containing this information, then shared it with Dyke. *Id*. ¶ 5.[3]

Fourth, it is untrue that IPS shares with its customers all the data, files, programming, and information that Landsverk retained and/or shared with Dyke, and that an end user customer can do whatever it wants with IPS's work product. *See* Oppos. Mem. at 12-13. The electrical control system industry is not "open source" as Landsverk would

---

[3] Landsverk's access included special rights to other highly confidential company documents and data, including computer folders for Human Resources, IPS Business Plan, Legal, and Project List. *Id*.

have this Court believe. In simple terms, IPS provides to end users custom programmed software that is used to automate and control machines, instrumentation, and processes for daily operation at clients' facilities. That software is project-specific; it cannot be updated and used by the end user, or anyone else (including a subcontractor like Corval), to be used on future projects unless IPS agreed in writing. Nelson Suppl. Decl. ¶ 6.

The project documentation supports this conclusion. The purchase order with the vendor typically contains language limiting how that vendor can use or disclose the information supplied by IPS. For example, a Corval purchase order contains the following:

> Vendor agrees that it shall not, without written consent, use or disclose any confidential information or data, material or deliverables created, developed, produced or otherwise obtained in the course of the work required hereunder for any purpose except as necessary to implement or perform the PO and shall protect same using the same standard of care as it uses to protect its own confidential information.

*Id.* Ex. A.

IPS also has its own Terms and Conditions documentation, which states among other things:

> All devices, designs (including drawings, plans and specifications), estimates, prices, notes, electronic data and other documents or information prepared or disclosed by Seller, and all related intellectual property rights, shall remain Seller's property. Seller grants Buyer a non-exclusive, non-transferable license to use any such material solely for Buyer's use of the Equipment. Buyer shall not disclose any such material to third parties without Seller's prior written consent.

*Id.* Ex. B.

In addition, a typical project plan and specification for an end user contains provisions that IPS's supplied software is owned by the end user, that the end user will use the software only for the project that is the subject of the purchase, but that IPS may use the software to build upon for future projects. Nelson Suppl. Decl. ¶ 9. But even if there were some question about these ownership issues, Landsverk did not retain only IPS's final work product. He retained IPS's entire library of standards, "function blocks", and other programming work which IPS has invested huge amounts of capital in creating.

Fifth, IPS's trade secret claims are not limited to information Landsverk shared with Dyke in connection with work on Corval projects. *See* Oppos. Mem. at 4-5, 12. Landsverk retained access to IPS's *entire* server, which contained *all* of IPS's confidential and trade secret information, and he *bragged* about maintaining backdoor access to all of that information. His opposition to IPS's motion itself shows his continued inappropriate access to IPS's information: he attaches two email strings from his IPS email account, yet does not explain why or how he possesses those emails. It is anyone's guess what other IPS emails and trade secrets he still retains and is using.

Ultimately, this Court need not rely upon Landsverk's and Dyke's present promises not to use IPS's information as a reason to deny IPS's motion. Even when an employee proclaims he has no intention of using confidential information acquired by the former employer, a court need not rely on such assurance. *See, e.g.*, *ClearOne Commc'ns, Inc. v. Chiang*, 2008 WL 4153768, at *1 (D. Utah) ("Chiang's only direct proof that he did not take any trade secret information from Old ClearOne or know of anyone doing so is his own testimony. But the court is not obliged to believe self-serving statements of parties.");

6

*Superior Consultant Co. v. Bailey*, 2000 WL 1279161, at *6 (E.D. Mich.) (granting injunctive relief, even though "[b]y way of affidavit, defendant Bailey attests that he does not believe he has violated any of his obligations to Superior, and that he has not and will not use any of Superior's confidential or trade secret information"); *Robert Half Int'l, Inc. v. Stenz*, 2000 WL 1716760, at *7 (E.D. Pa.) (holding "the Court cannot find and the Defendant does not point to any reason why the public interest is not served by enjoining the Defendant from utilizing the information and contacts obtained through their employment with the Plaintiff," notwithstanding that "the Defendant has stated that he has not been soliciting business from his former clients, has not used confidential information that he obtained from his employment with the Plaintiff, and that his new employer targets a different clientele than the Plaintiff").

Defendants knew what they were doing was wrong, predicted (rightly) they would get sued for it, and destroyed evidence to hide their misconduct. Their pledges of good behavior are not credible. *See, e.g.*, *Contour Design, Inc. v. Chance Mold Steel Co.*, 2012 WL 82864, at *6 (D.N.H.) (assertion that defendant "did not use any of Contour's confidential information" was "impossible to credit" given evidence showing otherwise); *United States v. Stone*, 2006 WL 2990246, at *2 (W.D. Mich.) ("Defendants argue because the Affidavits are a denial by Defendants of the acts under oath, the Court cannot properly conclude that an injunction is appropriate. The Court again disagrees."). Moreover, the DTSA and MUTSA specifically authorize an injunction even when misappropriation is merely threatened. 18 U.S.C. § 1836(b)(3)(A)(i); Minn. Stat. § 325C.02(a).; *Katch, LLC v. Sweetser*, 143 F.Supp.3d 854, 869-70 (D. Minn. 2015)

("Minnesota Statute § 325C.02(a) allows for injunctive relief even where there is only a threat of misappropriation."); *Reliastar Life Ins. Co. v. KMG Am. Corp.*, 2006 WL 2529760, at *4 (Minn. App.) ("Actual or threatened misappropriation may be enjoined.").

### C. IPS competes with Lanix in the industrial refrigeration control market.

Defendants argue they are not violating any duties to IPS because IPS does not "focus" on industrial refrigeration control work. *See* Oppos. Mem. at 2. This argument fails on both the facts and the law.

IPS provides services in to clients who utilize industrial refrigeration at their facilities, and has done so for years. Since at least 2012 (before Landsverk joined IPS), IPS was performing work at facilities that utilize industrial refrigeration. *See* Nelson Suppl. Decl. ¶ 1. Defendants essentially admit IPS's work in this area, stating that Landsverk "did some of this work at IPS." *See* Oppos. Mem. at 2. They then argue IPS "has never contacted Corval to try and ***continue*** work in this area." *Id*. at 9 (emphasis added). But to continue work obviously means IPS was already doing it.[4]

For IPS to perform this work, it has relied on a team of employees in engineering, autoCAD, purchasing, programming, UL 508 and 698 Panel Fabrication, and field service. For some of IPS's projects in this area, Landsverk was *one* member of that team. Nelson Suppl. Decl. ¶ 2. Lansdverk's unsupported claim that he was the only person performing

---

[4] Defendants emphasize this argument as some sort of waiver of IPS's claims. *See* Oppos. Mem. at 5, 9. But obviously IPS did not want to contact Dyke during this dispute to pitch continued work for Corval. Nor did IPS want to pitch others at Corval, which, depending on the results of expedited discovery, may be named as another defendant who aided and abetted Landsverk's and Dyke's misconduct. Nelson Suppl. Decl. ¶ 3.

this work for IPS is simply false. The bottom line is Landsverk retained IPS's confidential and trade secret information to perform work in direct competition with IPS. *See* Dyke Decl. ¶ 15 (admitting Landsverk retained IPS information to perform work for Corval).

The confidential and trade secret information Defendants admittedly retained and are presently using, and the opportunities Landsverk and Dyke withheld from IPS and instead steered to Lanix, violate obligations to IPS. This would be true even if that information or those opportunities relate only to the industrial refrigeration market (which they don't). It is irrelevant how much IPS may or may not "focus" on this market as part of its overall services portfolio. The information was stolen, and the opportunities withheld, and IPS has shown this wrongdoing is irreparably harming IPS.

### D. Landsverk destroyed evidence, with Dyke's coaching, specifically to avoid detection.

Landsverk claims now he "reset" his computer simply as a matter of course like any soon-to-be former employee would do. Landsverk Decl. ¶ 21. He forgets his texts with Dyke days before his resignation, when Landsverk suggested to Dyke he would give IPS his phone, laptop, and iPad. Dyke was surprised, asking: "But wiped? Don't want him seeing your emails?" Landsverk responded: "Haha, coming from an IT guy come on man. Of course wiped." Nelson Suppl. Decl. ¶ 11, rows 109-113. In addition, Landsverk's claims of voluntarily offering up the various passwords and administrative rights to his "backdoor" server access are untrue. Only after being confronted by IPS with his damning texts with Dyke (and his subsequent admissions of wrongdoing), did Landsverk send IPS that information. Nelson Suppl. Decl. ¶ 10.

9

Landsverk's new explanations for his behavior are not credible, particularly when combined with his admissions to Dyke and Nelson that he knew his conduct was wrong and the he would probably get sued by IPS. *See* Arnold Decl. Ex. A rows 1349, 1351 (Dyke: "Lori gonna convince Pete to sue you"; Landsverk: "Yeah maybe"); Nelson Decl. ¶ 30 (Landsverk: "I'm a dumbass.").

## CONCLUSION

This motion presents a clear case of an individual using special employment status and access to steal information and corporate opportunities. The Court should issue an order temporarily restraining Defendants from further violations of their statutory and common law duties to IPS, and an order for expedited discovery and to preserve evidence.

NILAN JOHNSON LEWIS PA

Dated: March 14, 2019     By:  *s/ Joel O'Malley*
                               Joel O'Malley (Reg. No. 0352573)
                               Pablo Orozco (Reg. No. 0396811)
                               120 South Sixth Street, Suite 400
                               Minneapolis, MN 55402
                               Phone: 612-305-7500
                               Fax: 612-305-7501
                               jomalley@nilanjohnson.com
                               porozco@nilanjohnson.com

                          ATTORNEYS FOR PLAINTIFF