# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| INTEGRATED PROCESS SOLUTIONS, INC., | Case No. 19-CV-567 (NEB/LIB) |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION |
| LANIX LLC, KEVIN LANDSVERK, and DYLAN DYKE, | |
| Defendants. | |

Integrated Process Solutions, Inc. ("IPS") has sued Lanix, LLC ("Lanix"), its owner—Kevin Landsverk—and Dylan Dyke for breaches of fiduciary duties and the duty of loyalty as well as violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. §§ 325.01–.08, and Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. The claims revolve around Landsverk's departure from his employment at IPS and his alleged conspiracy with Dyke, who is an employee for a customer, to draw business away from IPS. IPS seeks to enjoin the Defendants from using or disclosing its trade secrets and confidential information allegedly taken by Landsverk before he left IPS's employ. Additionally, IPS requests that the Court issue an order setting an expedited discovery schedule and requiring the Defendants to preserve all evidence related to the case.

## BACKGROUND

IPS designs, builds, implements, and integrates electrical systems in Minnesota, Wisconsin, and other parts of the Midwest. [ECF No. 8 ¶ 1.] It manufactures and sells specialized goods including "custom solenoid, remote terminal, or programmable controller panels; protective relaying cabinets; Distribution Control system control rooms; and photovoltaic systems." (*Id.*) IPS describes itself as "a leader in the implementation of municipal and industrial controls and instrumentation systems." (*Id.*) Its goods and services are often used by industrial or municipal operators of water and waterway systems. (*Id.* at ¶ 4.) It provides a variety of services to those customers, including planning, requirements, design and submittal, implementation, testing, startup, commissioning, and product service and support. (*Id.* at ¶ 10.)

IPS hired Landsverk on June 17, 2013 as a Control Systems Engineer and the person responsible for IPS's Information Technology ("IT") systems. (*Id.* at ¶ 11). Landsverk's duties at IPS included:

- As IPS representative, coordinate projects for the management and design of control system projects for water/wastewater treatment facilities
- UL panel shop supervisor
- Implement supervisory control and data acquisition (SCADA) systems for a variety of process control systems
- System database development; HMI and operator interface design and programming, PLC programming, HMI/OIT programming, network design and implementation
- Customer acceptance testing installation, on-site training, system start-up, and support

- AutoCAD design and drafting
- Submittal and O&M documentation
- Interface with customer/consultant as the face of IPS in order to keep project on track from design stage through startup and test until final completion/acceptance
- Serve as the face of IPS to provide onsite, online, and telephone service for existing customers
- IT support, software administrator, and software license manager for IPS including pfSense Firewall, network hardware, exchange server, KVM server, Owncloud server and workstations

(*Id.* at ¶ 12). IPS contends that Landsverk's duties expanded over time and he became a "*de facto* IT specialist, salesperson, and project manager in addition to his original duties as a field engineer." (*Id.*) And, according to IPS, Landsverk was privy to a great deal of sensitive and confidential information. (*Id.* at ¶ 13.) He even had computer server at his home to backup IPS's electronically stored files. (*Id.* at ¶ 14.) IPS contends that Landsverk "developed special relationships with IPS's customers" and that he "was the face of IPS with certain customers." (*Id.* at ¶ 9.)

During his time at IPS, Landsverk frequently communicated with his friend Dylan Dyke, a systems engineer at one of IPS's customers, Corval Group, Inc. After Landsverk left IPS, IPS recovered text messages between Dyke and Landsverk in which the two expressed frustrations about their jobs, believing they were under-compensated. [ECF No. 9 at 11.] Landsverk sent various messages to Dyke discussing his plan to start his own company. (*Id.* at 6–11.) The two planned to direct Corval business to Lanix instead of IPS. (*Id.* at 6–8.) In these conversations, Landsverk expressed an intent to take IPS

information to start his company. (*Id.*) The two also discussed Landsverk giving Dyke a cut of his profits. (*Id.* at 8, 10.) Landsverk was concerned about the possibility of getting sued by IPS (*Id.* at 9) and told Dyke he wiped all his company devices. (ECF No. 22 at 4.)

Before leaving IPS, Landsverk created his company, Lanix LLC. [ECF No. 8 ¶ 23.] Then, on February 8, 2019 Landsverk gave his two weeks' notice to IPS. (*Id.* at ¶ 16). Landsverk stated it was a "gut wrenching decision" and that he was leaving all his tools, laptop, and iPad on his desk. (*Id.* at 16–17.) After Landsverk resigned, IPS recovered copies of text messages between Landsverk and Dyke. (ECF No. 9 ¶ 4.) IPS also recovered Landsverk's desktop computer, laptop, and iPad. [ECF No. 10 ¶ 2.] A forensic service was able to recover 327 emails from Landsverk's email account, but only seven of the recovered emails predated January 24, 2019. (*Id.* at ¶ 5.) The service also determined that the desktop and laptop computers had been recently wiped and had little content on them (*Id.* at ¶ 7–8.)

IPS's founder, Peter Nelson, confronted Landsverk about the text messages and accused him of stealing company information. (ECF No. 8 ¶ 30). Nelson contends that Landsverk "apologized for his actions, said he knew what he had done, and said, 'I'm a dumbass.'" (*Id.*) Nelson claims Landsverk also admitted to sending Dyke IPS's confidential financial information. (*Id.*)

On February 27, 2019, IPS sent Landsverk a cease and desist letter with a variety of demands, including that he immediately cease wrongfully competing against IPS.

[ECF No. 7 at 13–24.] Landsverk responded on March 6, 2019. (*Id.* at 26–28). Landsverk agreed to (1) "deliver the hard drives used for the backup server to whomever IPS directs him to deliver them to,"[1] (2) provide counsel with "the usernames and passwords he is aware of" that he created while employed at IPS and (3) provide the following assurances:

   a. He never copied data from the backup server and has no copies of any such data other than the hard drives he has agreed to return;
   b. He has not used any IPS information for competitive purposes or otherwise; and
   c. While he intends to keep working with Corval, he will not solicit any other IPS customer to provide the same or similar services IPS provides for a period of one year.

(*Id.* at 28). In the meantime, however, Lanix has been working for Corval. [ECF No. 19 ¶ 19, No. 20, ¶¶ 24–26.] Corval has awarded three purchase orders to Lanix, for which Lanix will receive almost $75,000. (*Id.*)

IPS filed its complaint against Landsverk, Dyke, and Lanix,, alleging breaches of fiduciary duties and the duty of loyalty as well as violations of the DTSA, MUTSA, and CFAA. [ECF No. 1 "Compl.".] At the same time, IPS moved for a temporary restraining order to enjoin the Defendants from "any activities in violation of the Defendants' respective common law and statutory duties." [ECF No. 3 ¶ 1.] In its memorandum in support for its motion, IPS elaborates that it would like the Court to enjoin the Defendants

---

[1] IPS has since obtained the server from Landsverk. [ECF No. 20 ¶ 19.] Landsverk stated that immediately after he left IPS, he told Peter Nelson to make arrangements to pick up the server. (*Id.*) It was not until three weeks later that counsel for IPS directed Landsverk to deliver the server to a certain address, which Landsverk did the next day. (*Id.*)

from "further using or disclosing its confidential information and trade secrets, including from the backup IPS server that Landsverk still possesses." [ECF No. 6 at 7.] IPS also seeks an order setting an expedited discovery schedule and an order to preserve all evidence relating to this case.[2] [ECF No. 3 ¶¶ 2–3.]

## ANALYSIS

IPS asks the Court to enjoin[3] the Defendants under Fed. R. Civ. P. 65(a) from "any activities in violation of the Defendants' respective common law and statutory duties." [ECF No. 3 ¶ 1.] When evaluating a motion for a preliminary injunction, courts consider the following four factors: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest" *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citing *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 112–14 (8th Cir. 1981)). In considering these factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that

---

[2] It is unnecessary for the Court to order Defendants to follow its already-existing duty to preserve evidence when the law so requires. *See Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 247 F.R.D. 567, 570 (D. Minn. 2007) ("[A] party must preserve evidence that it has notice is reasonably likely to be the subject of a discovery request even before a request is actually received." (citation omitted)).

[3] IPS provided the Defendants with notice of its motion, and thus the Court will treat its motion for a temporary restraining order as a motion for a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure.

6

justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (citation omitted). "Preliminary injunctions are extraordinary remedies, and the party seeking such relief bears the burden of establishing its entitlement to an injunction under the *Dataphase* factors." *Reliable Prop. Servs., LLC v. Capital Growth Partners, LLC*, 1 F. Supp. 3d 961, 963 (D. Minn. 2014) (citing *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

### I. Likelihood of Success on the Merits

At the outset, IPS must prove a likelihood of success on the merits. To satisfy this requirement, IPS must show it has a "fair chance of prevailing" on the merits. *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). This Court may not grant an injunction if "there is no chance of success on the merits." *Mid-America Real Estate Co. v. Iowa Realty Co., Inc.*, 406 F.3d 969, 972 (8th Cir. 2005). However, IPS need only show it can prevail on one claim, not every claim raised in its complaint. *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002).

### A. Breach of Duty Claims

IPS brought two breach of duty claims against Landsverk—breach of the duty of loyalty and breach of the duty of confidence.[4] (Compl. at 9). Under Minnesota law,

---

[4] IPS fashions the claims as breach of duty of loyalty and breach of fiduciary duty. (Compl. at 9). In Minnesota, however, employees have two fiduciary duties to their employer—the duty of loyalty and the duty of confidence. *Commodities Specialists Co. v. Brummet*, No. CIV. 02-1459 JRTFLN, 2002 WL 31898166, at *5 (D. Minn. Dec. 27, 2002) (citing *Eaton Corp.*

7

employees owe a duty of loyalty to their employer. *Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn. Ct. App. 1987), *review denied* (Minn. Dec. 16, 2008). An employee breaches that duty when he or she "solicit[s] the employer's customers for [himself], or from otherwise competing with [his] employer, while [he] is still employed." *Id.* Minnesota courts draw the distinction that employees may still "prepare to enter into competition with [their] employer" while they are still employed. *Id.* "There is no precise line between acts by an employee which constitute prohibited 'solicitation' and acts which constitute permissible 'preparation.'" *Id.* at 305. Rather, "[b]ecause of the competing interests, the actionable wrong is a matter of degree." *Id.*

IPS claims Landsverk breached his duty of loyalty by using IPS's confidential and proprietary information for his own gain, soliciting IPS's employees, soliciting IPS's customers, and diverting business from IPS while still employed. (Compl. at 9–10). At the very least, the record appears to show Landsverk solicited IPS's customers while still employed at IPS. Dyke and Landsverk appear via text message to agree to have Dyke redirect Corval business from IPS to Lanix. [ECF No. 9 at 6.] This crosses the line from merely preparing to compete to actively soliciting IPS's customers while employed. *See Schmidt v. Blue Lily Farms LLC*, No. A08-1398, 2009 WL 2151135, at *2 (Minn. Ct. App. July 21, 2009) ("[A]n employee breaches the duty of loyalty, and thus engages in employment

---

*v. Giere*, 971 F.2d 136, 141 (8th Cir.1992)). As such, the Court will construe the claims as breach of duty of loyalty and breach of the duty of confidence.

8

misconduct, by encouraging a third party to terminate a contract between the employer and the third party."); *Marn v. Fairview Pharmacy Servs. LLC*, 756 N.W.2d 117, 122 (Minn. Ct. App. 2008) (finding a breach of an employee's duty of loyalty when the employee solicited a business partner to terminate its contract with his employer). IPS is thus likely to prevail on its breach of the duty of loyalty claim against Landsverk.

IPS's complaint also includes a claim against Dyke for aiding and abetting breaches of duty. (Compl. at 16). "A claim for aiding and abetting the tortious conduct of another has three elements: (1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach." *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn.1999).

IPS is likely to succeed on its claim that Dyke aided and abetted Landsverk in breaching his duty of loyalty. Landsverk likely breached his duty of loyalty to IPS by working with Dyke to divert Corval business from IPS to Lanix. It is likely that Dyke knew Landsverk's behavior constituted a breach of duty, in part because the two discussed the possibility of litigation as a result of their plan. [ECF No. 9 at 9.] Additionally, the recovered text messages show Dyke actively pushing Landsverk to start Lanix and take business from IPS. (*Id.* at 6–7.) Dyke argues he had no role in awarding Lanix any work from Corval. [ECF No. 19 ¶ 17.] Even if Dyke played little role Lanix's

9

contracts with Corval, however, the record is abundantly clear that Dyke encouraged Landsverk to breach his duty of loyalty with IPS. As a result, the Court finds IPS is likely to succeed on its aiding and abetting claim.

### B. Trade Secret Misappropriation Claims

IPS also alleges all Defendants violated the Defendant Trade Secrets Act and the Minnesota Uniform Trade Secrets Act. (Compl. at 11–14). To prevail on its claims, IPS must prove (1) the existence of a trade secret and (2) the misappropriation of that trade secret. *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018).

#### 1. Existence of a Trade Secret

Both the MUTSA and the DTSA define "trade secret" as information that "information that (1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." *Id.* (internal quotation marks and citation omitted). What trade secrets exactly are at issue here is not clear to the Court. IPS's motion for temporary restraining order simply asks the court to order the Defendants to follow their common law and statutory duties. [ECF No. 3 at 1.] It makes no reference to specific information or products. At oral argument, IPS attempted to clarify that the trade secretes include (1) financial records; (2) bidding information; and (3) standards, blocks, and software. This additional information did not sufficiently clarify what trade secrets are at issue, because IPS did not explicitly show that this information was not readily ascertainable, has value,

and is the subject of reasonable efforts to protect its secrecy. *See SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, No. CIV.03-3302(RHK/FLN), 2006 WL 1472860, at *1 (D. Minn. May 26, 2006), *aff'd*, 491 F.3d 350 (8th Cir. 2007) ("To succeed on a trade secret claim, a plaintiff must first define its alleged trade secrets with sufficient specificity."); *see also Int'l Bus. Mach. Corp. v. Seagate Tech., Inc.*, 941 F. Supp. 98, 100 (D. Minn. 1992) ("[A]n injunction is inappropriate if plaintiff fails 'to identify specific trade secrets and instead produces long lists of general areas of information which contain unidentified trade secrets.'" (citation omitted). At this point in the litigation, the Court cannot say it is likely for IPS to succeed in proving there are valid trade secrets at issue in this case.

2. **Misappropriation**

The fact that the Court cannot precisely identify the trade secrets at issue in this case highlights the fatal flaw in IPS's trade secret claims in their current iteration. IPS must prove the Defendants knowingly stole or copied trade secrets. *See* 18 U.S.C. § 1832; Minn. Stat. § 325C.01 Subd. 3. To be sure, the record includes plenty of evidence that Landsverk intended to take IPS's information. And the text messages certainly raise concern with the Court. But Landsverk has declared under penalty of perjury that despite his stated intent, he has not actually taken or used IPS's information. [ECF No. 20 ¶¶ 19–22.] And in response, IPS included no evidence that Landsverk actually took or used any information. It asserts generally that Lanix could not be doing the work it is doing without taking trade secrets from IPS but provides no additional evidence or analysis to

support this conclusion. IPS also cites several cases where courts have disregarded statements by the defendant in trade secret cases. *See ClearOne Commc'ns, Inc. v. Chiang*, No. 2:07-CV-37TC, 2008 WL 4153768, at *1 (D. Utah); *Superior Consultant Co. v. Bailey*, No. 00-cv-73439, 2000 WL 1279161, at *6 (E.D. Mich.); *Robert Half Int'l, Inc. v. Stenz*, 2000 WL 1716760, at *7 (E.D. Pa.). While the Defendants' declarations might be self-serving and the Court may have disregarded them in other circumstances, it will not do so here because at this point in the litigation, the Court has no evidence that Landsverk misappropriated trade secrets. Thus, on this record, the Court concludes that IPS is not likely to succeed on its misappropriation of trade secrets claim.[5]

### C. Computer Fraud and Abuse Act Claim

Finally, IPS claims Landsverk violated the Computer Fraud and Abuse Act. (Compl. at 14). The CFAA makes it a crime to "intentionally access[] a computer without authorization or exceed[] authorized access, and thereby obtain[] . . . information from any protected computer." 18 U.S.C. §1030(a)(2). A "protected computer" is defined as a computer "used in or affecting interstate or foreign commerce or communication" and

---

[5] The Court similarly finds the IPS cannot succeed on its breach of the duty of confidentiality claim. "[A] common law duty of confidentiality arises out of the employer-employee relationship only as to information which the employer has treated as secret*." Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 903 (Minn. 1983). The record does not contain evidence that Landsverk disclosed any information which IPS had treated as secret.

12

the Eighth Circuit has held that computers connected to the internet are used in interstate commerce. 18 U.S.C. § 1030(e)(2)(B); *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007). The CFAA provides a private violation for violations of the statute under certain circumstances. § 1030(g). Here, the only applicable circumstance would be if the violation caused "loss to 1 or more persons during any 1-year period. . . aggregating at least $5,000 in value." § 1030(c)(4)(A)(i)(I).

Federal courts are split on "whether the CFAA is violated when a person who has authority to 'access[ ] a protected computer' misuses the information that he or she obtains." *Sebrite Agency, Inc. v. Platt*, 884 F. Supp. 2d 912, 917 (D. Minn. 2012). Some courts have held that employees exceed their authority to access a protected computer when they use information for an improper purpose obtained from an employer's computer, even if they have authority generally to access that information. *See, e.g.*, *United States v. Rodriguez*, 628 F.3d 1258, 1263 (11th Cir. 2010), cert. denied, 563 U.S. 966 (2011); *United States v. John*, 597 F.3d 263, 272 (5th Cir. 2010), cert. denied, 568 U.S. 1163 (2013); *Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 420–21 (7th Cir.2006). Other courts maintain employees only exceed authorization under CFAA when they use a computer or obtain information they do not have authority to use or obtain—not when they merely misuse information they had proper authority to access. *See, e.g.*, *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 203-07 (4th Cir. 2012).

The Eighth Circuit has not commented on this split, but courts in this district have repeatedly adopted this narrower view. *See Sebrite Agency, Inc. v. Platt*, 884 F. Supp. 2d at 917–18 ("The Court continues to believe that the narrower interpretation of the CFAA is more consistent with statutory text, legislative history, and the rule of lenity."); *see also TripleTree, LLC v. Walcker*, No. CV 16-609(DSD/TNL), 2016 WL 2621954, at *3 (D. Minn. May 6, 2016); *Lube-Tech Liquid Recycling, Inc. v. Lee's Oil Serv., LLC*, No. 11-2226, 2013 WL 2420448, at *2 (D. Minn. June 3, 2013); *Walsh Bishop Assocs., Inc. v. O'Brien*, No. 11-2673, 2012 WL 669069, at *2-3 (D. Minn. Feb. 28, 2012); *Xcedex, Inc. v. VMware, Inc.*, No. CIV. 10-3589 PJS/JJK, 2011 WL 2600688, at *4 (D. Minn. June 8, 2011), *report and recommendation adopted*, No. 10-CV-3589 PJS/JJK, 2011 WL 2581754 (D. Minn. June 30, 2011); *Condux Int'l, Inc. v. Haugum*, No. CIV 08-4824 ADM/JSM, 2008 WL 5244818, at *5 (D. Minn. Dec. 15, 2008).

This Court finds the reasoning of the cases in this district persuasive. The CFAA defines "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." § 1030(e)(6). The plain language of the statute seems to be referring to the *access* of information, not the use. The statutory section is silent on the issue of how the information is used once it has been obtained, either properly or improperly. Additionally, as the court noted in *Sebrite Agency, Inc.*, adopting the broader interpretation would essentially transform "just about every state-law claim for

misappropriation of trade secrets into a federal lawsuit . . . not to mention expose employees who violate their employers' computer-use restrictions to criminal liability" and "if Congress meant to so vastly expand the jurisdiction of the federal courts, Congress would have been much more explicit." 884 F. Supp. 2d at 918. Under the narrower interpretation, IPS's claim likely fails. Landsverk claims to have returned his computer and devices and turned off the server after leaving IPS. There is no evidence Landsverk accessed an IPS computer without authorization or exceeded the scope of his authorized access while an employee.

**II.     Irreparable Harm**

IPS must also show it will likely be irreparably harmed without its requested injunctive relief. "A plaintiff must show more than a future risk of irreparable harm; [t]here must be a clear showing of immediate irreparable injury." *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 974 (D. Minn. 2018) (internal quotation marks and citation omitted). And, importantly, the harm must not be compensable by money damages. *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986); *Carlson v. City of Duluth*, 958 F. Supp. 2d 1040, 1059 (D. Minn. 2013) ("It is well-established that where a party will only suffer potential monetary loss, and money damages are calculable, there is an adequate remedy at law and no irreparable harm exists."). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

IPS argues it will be irreparably harmed without injunctive relief. However, without specific evidence of any confidential or proprietary information Landsverk has taken and used, it is difficult for the Court to see how IPS will be irreparably harmed.[6] There is no evidence in the record that the Defendants have damaged IPS's goodwill or reputation among its customers. *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("[P]otential loss of consumer goodwill qualifies as irreparable harm."). Nor is there any evidence of a restrictive covenant that would govern Landsverk's actions after he left IPS. *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1091 (D. Minn. 1981), *aff'd*, 684 F.2d 565 (8th Cir. 1982) ("[A] threat of irreparable harm can be inferred from the breach of a valid and enforceable restrictive covenant."). Without a restrictive covenant, Landsverk and Lanix may freely compete with IPS.

IPS argues that Lanix has taken Corval business from IPS. [ECF No. 21 at 2] Lost profits of this nature, however, are compensable through money damages because they are concrete, finite, and easy to determine. *Wells Fargo Ins. Servs. USA, Inc. v. King*, No. 15-cv-4378 (PJS/JJK), 2016 WL 299013, at *8 (D. Minn. Jan. 25, 2016) (finding no irreparable harm when the court was "able to identify the lost clients and quantify the lost profits." IPS's alleged losses at this point could only conceivably include the three purchase orders

---

[6] The Court notes that this determination is based on the current stage of litigation and the record as it exists at the time of this motion. If more evidence comes to light illustrating irreparable harm, its evaluation may change.

awarded to Lanix for which Lanix will receive about $75,000. IPS provides no reason it cannot recoup its alleged losses it incurred through damages at the end of this case.

IPS also argues that mere threatened misappropriation warrants injunctive relief. Yet that notion is not supported by the language of the DTSA or the MUTSA, which both simply state courts *may* award injunctive relief for threatened misappropriation. *See* 18 U.S.C. § 1836(b)(3)(A)(i); Minn. Stat. § 325C.02(a); *see also Beatty*, 354 F. Supp. at, 974 ("[T]he plain text of these statutes does not provide that the mere threat of misappropriation leads to an inference of irreparable harm or a presumption that injunctive relief should be ordered."). The law does not require that courts *must* award injunctive relief under those circumstances. While there are certainly circumstances where awarding injunctive relief is appropriate with a party has threatened misappropriation, this is not one of those cases because any threats by Landsverk appear to be empty. He has returned the server and all IPS devices, which he lawfully had in the first place, and has made explicit promises not to use any of IPS's information. And there is no evidence he has used any of IPS's information. The record thus does not support the concern that Landsverk will immediate misappropriate trade secrets without injunctive relief. The Court therefore finds IPS will not be irreparably harmed absent injunctive relief.

### III. Balance of Harms

At this point in the litigation, the Court's analysis of the balance of harm to each party in granting or denying the preliminary injunction is neutral. Because the Court cannot identify the alleged trade secrets or how they are being appropriated, it is difficult to evaluate how IPS will be harmed without an injunction. Similarly, therefore, it is difficult to see how the Defendants will be harmed by an order requiring them to avoid misappropriating trade secrets.[7]

### IV. Public Interest

The Court's analysis of the public interest in granting or denying the preliminary injunction is also neutral. Public interest generally favors unrestrained competition as well as the protection of confidential information. *Menzies Aviation (USA), Inc. v. Wilcox*, 978 F. Supp. 2d 983, 1001 (D. Minn. 2013). And this case does not implicate any other broad area of interest to the public. Public interest therefore plays very little role in the court's balancing of the *Dataphase* factors.

---

[7] At one point during the March 15 hearing, counsel for IPS stated it wants the court to temporarily shut down Lanix as a whole. While this request is inconsistent with the other requests for injunctive relief, to the extent IPS seeks to shut down Lanix's entire business, the balance of harms clearly weighs in the Defendants' favor.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT IPS's motion for a preliminary injunction [ECF No. 3] is DENIED.

IT IS FURTHER ORDERED that IPS's motion for expedited discovery is DENIED. If the parties, after engaging in further discussions regarding settlement, cannot reach agreement and IPS still requests expedited discovery, it may bring a renewed motion to the Magistrate Judge assigned to this case.


Dated: March 18, 2019

BY THE COURT:

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge